

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| McDANIEL PARTNERS, LTD., | | No. 08-12-00312-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 112th District Court |
| | § | |
| APACHE DEEPWATER, LLC, | | of Upton County, Texas |
| | § | |
| Appellee. | | (TC # 11-01-U4167-ANC) |
| | § | |

## O P I N I O N

We consider today an oil and gas assignment executed in 1953 which provides for a production payment to the assignor. At issue is the construction of a parenthetical clause describing the manner of calculating the payment and whether the expiration of two of the four leases underlying the Assignment impacts the equation. McDaniel Partners, Ltd., appeals the trial court's final judgment allowing for a proportionate reduction in the production payment. We reverse and render judgment for McDaniel, and remand for calculation of attorney's fees and damages.

### PRECISE LANGUAGE OF THE ASSIGNMENT

[Ferguson] reserves unto himself, his heirs, representatives and assigns, and there is expressly excepted from this conveyance as a 'production payment interest,' the title to and ownership of one-sixteenth of thirty-five sixty-fourths of seven-eighths **(1/16th of 35/64ths of 7/8ths, being one sixteenth of the entire interest in the production from said lands to which Assignor claims to be entitled under the terms of said respective oil and gas leases)** of the total oil, gas, casinghead gas

and other minerals in and under and which may be produced from the above described land, i.e., from each and both of said Surveys 36 and 37, Block 40, Township 5 South, T&P Ry. Co. Lands, until the net proceeds of said reserved interest . . . shall have amounted in the aggregate to the sum of Three Million Five Hundred Fifty Thousand Dollars ($3,550,000.00) . . . [and] one million four hundred twenty thousand (1,420,000) barrels . . . .

As we have mentioned, the highlighted parenthetical is the focus of this dispute.

## FACTUAL SUMMARY

This case concerns the rights and obligations of McDaniel Partners, Ltd. and Apache Deepwater, LLC in relation to the assignment of four oil and gas leases situated in Upton County. The Assignment was executed on March 3, 1953 by McDaniel's predecessor in interest, Hugh W. Ferguson, Jr., as assignor, in favor of Apache's predecessor, L.H. Tyson, as assignee.[1] Among other things, the Assignment reserves a substantial production payment on behalf of Ferguson and his successors. At the time of the Assignment, the four leases owned by Ferguson comprised 35/64 of the total mineral estate underlying two particular tracts of land, Survey 36 and Survey 37. The Cowden 36 lease was situated entirely within Survey 36 while the Cowden 37 lease was situated entirely within Survey 37. The two remaining leases--Peterman and Broudy--consist of noncontiguous parcels of land located in both Survey 36 and Survey 37.[2] Employing the fraction 64/64 to represent the entirety of the mineral estate underlying Surveys 36 and 37, the portion of the minerals attributable to each of the four leases at the time of the conveyance was as follows:

- Cowden 36 lease:  16/64 of the total;

- Cowden 37 lease:  16/64 of the total;

- Peterman lease:  1/64 of the total; and

---

[1]  McDaniel's corporate representative in this case is Hugh W. Ferguson, III.

[2]  The Peterman and Broudy leases also contain other parcels of land located outside of Survey 36 and Survey 37, but  those parcels were not included in the Assignment.

- Broudy lease: 2/64 of the total.

In 1994, the Cowden 36 and Cowden 37 leases expired for lack of production. Although there had been no production in Survey 36 or Survey 37 under the Peterman and Broudy leases, those leases nonetheless endured due to production on parcels located outside of Surveys 36 and 37, which were not part of the Assignment. There continued to be an absence of production in Surveys 36 and 37 under the assigned leases until sometime in late 2009 or early 2010, when Apache began drilling after acquiring its interest.[3] When Apache acquired the Assignment, it obtained only a 3/64 interest, as the two Cowden leases had already terminated. In other words, despite the Assignment's purported grant of all four leases, the only leases that Apache actually obtained were the two viable Peterman and Broudy leases. Although Apache never owned an interest in the Cowden 36 or Cowden 37 leases, it nonetheless presently owns the leasehold rights in the mineral interests that were originally covered by those leases. Following the completion of producing wells in Surveys 36 and 37, Apache sent a division order to McDaniel in which it disclosed its calculation of monies owed pursuant to McDaniel's production payment interest. According to Apache, McDaniel is entitled to 1/16 of 3/64 of 7/8 of the production stemming from Surveys 36 and 37, with the middle fraction representing the portion of the total mineral estate that is attributable to only the Peterman and Broudy leases (1/64 + 2/64 = 3/64 ). Stated in decimals, it is Apache's contention that McDaniel is entitled to .00256348 (or .256348 %) of the production attributable to Surveys 36 and 37. Conversely, McDaniel contends that it is entitled to 1/16 of 35/64 of 7/8 of the production, with the middle fraction representing the part of the mineral estate that was attributable to all four of the leases at the time the Assignment was executed (16/64 + 16/64 + 1/64 + 2/64 = 35/64). Stated in decimals, it is

---

[3] Apache's predecessor in interest, Mariner, obtained its interest in the Assignment in 2009. Apache acquired later merged with Mariner. In light of the shared business interests and structure between Apache and Mariner, Mariner will be included within the appellation "Apache."

3

McDaniel's contention that it is entitled to .029907226 (or 2.9907226 %) of the production attributable to Surveys 36 and 37.

## PROCEDURAL HISTORY

McDaniel filed suit against Apache on January 6, 2011, alleging claims for breach of contract, conversion, and attorney's fees, as well as a request for an accounting. Prior to trial, the parties agreed to the entry of stipulated facts. Neither contends that the Assignment is ambiguous; they simply disagree over the proper interpretation of its terms. Following a bench trial, the court rendered judgment against McDaniel, holding that it take nothing. McDaniel requested the entry of findings of fact and conclusions of law, which the trial court signed on October 3, 2012. The trial court ultimately determined that the production payment, per the terms of the Assignment, stems from four separately identifiable sources--namely, the minerals produced under each of four underlying leases. As such, held the court, the production payment must be proportionately reduced in the event one or more of the leases expires. In light of the termination of the two Cowden leases (which constituted 32/64 of the 35/64 interest that was conveyed in the Assignment), the court determined that the production payment is now properly payable out of 1/16 of 3/64 of 7/8 of the minerals underlying Survey 36 and Survey 37. McDaniel and Apache agree that the sole issue to be determined is the correctness of these determinations.

## APPLICABLE LEGAL STANDARDS

A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). For an ambiguity to exist, both interpretations must be reasonable. *Id.*; *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). When a written

4

agreement is worded so that it can be given a certain or definite legal meaning, it is not ambiguous and the court construes it as a matter of law. *American Manufacturers Mutual Insurance Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). In construing an unambiguous contract, a court should attempt to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *First City Nat. Bank of Midland v. Concord Oil Co*., 808 S.W.2d 133, 137 (Tex.App.--El Paso, 1991, no writ). We perform that review without considering parol evidence, and consider the entire document under the "four corners" rule. *Middleton v. Broussard*, 504 S.W.2d 839 (Tex. 1974); *Luckel v. White*, 819 S.W.2d 459, 461–62 (Tex. 1991).

## McDANIEL'S SOLE POINT

As framed by McDaniel, the single issue for review is:

The trial court failed to correctly interpret the Production Payment reserved in the 1953 Assignment consistent with (i) the parties' objective intent that the Production Payment be calculated and paid based upon 100% of production from the 'above described lands' (i.e., Surveys 36 and 37) and (ii) established Texas Supreme Court precedent which requires a production payment payable from 'above described lands' (i.e., Survey 36 and 37) to be calculated and paid based upon 100% of production from the lands which are described.

## THE *KING* AND *HOOKS* CASES

The distinction that McDaniel addresses is the difference between a reservation of "lands described" and "lands conveyed." It relies heavily upon *King v. First National Bank of Wichita Falls* to argue that the production payment must be calculated and paid out of production attributable to Surveys 36 and 37 as a whole, rather than production attributable only to the individual leases. *King v. First Nat. Bank of Wichita Falls*, 144 Tex. 583, 192 S.W.2d 260 (1946). But as a careful analysis reveals, neither *King* nor its counterpart *Hooks* applies here. *Id*.; *Hooks v. Neill*, 21 S.W.2d 532 (Tex.Civ.App.--Galveston 1929, writ ref'd).

5

*King* and *Hooks* define specific rules of construction applying to cases in which a grantor conveys an undivided mineral interest and reserves a fraction of that interest. *King*, 192 S.W.2d at 261-63; *Hooks*, 21 S.W.2d at 534-38. The questions presented in those cases and their progeny center on whether a grantor has reserved a royalty or mineral interest in only the portion of land actually conveyed, or whether the interest has instead been reserved from a larger tract of land described in the deed. *Id*; *Hooks*, 21 S.W.2d at 534; *Middleton*, 504 S.W.2d at 843; *Winegar v. Martin*, 304 S.W.3d 661, 667 (Tex.App.--Fort Worth 2010, no pet.). The distinction turns on whether the reservation clause describes the interest as being reserved from the land "conveyed" or from the land "described." *Middleton*, 504 S.W.2d at 842; *R. Lacy, Inc. v. Jarrett*, 214 S.W.2d 692, 693-94 (Tex.Civ.App.--Texarkana 1948, writ ref'd).

*King* establishes the controlling rule in instances where the deed reserves a fractional interest under the land "described." *King*, 192 S.W.2d at 263. There, a granting clause conveyed an undivided one-half interest in a parcel of land that was then physically described as a whole. *Id*. at 262. Thereafter in the reservation clause, a 1/8 royalty interest was reserved on behalf of the grantor in the "hereinabove described land." *Id*. Focusing on the use of that phrase, the court held that the grantor had reserved 1/8 royalty "from the entire land," rather than from only the undivided one-half interest that had been conveyed. *Id*. at 263. As such, the rule of *King* is that where a deed reserves a fraction of minerals under the "land described," it reserves a fraction of the minerals under the entire tract of land described in the deed, regardless of the part of the mineral estate actually conveyed. *Id*.; *Averyt v. Grande, Inc.,* 717 S.W.2d 891, 893 (Tex. 1986).

Conversely, *Hooks* establishes the controlling rule in instances where a deed reserves a fractional interest under the land "conveyed." *Hooks*, 21 S.W.2d at 538. In *Hooks*, the grantor owned and conveyed all of his undivided one-half interest in a tract of land. *Id*. In a reservation

6

clause, the grantor reserved a 1/32 interest in oil under the "said land and premises herein described and *conveyed*." *Id*. The court focused on the use of the words "and conveyed" in the reservation clause, and held that the deed unambiguously reserved 1/32 of the 1/2 mineral interest that the grantor conveyed, or a 1/64 mineral interest. *Id*. As the Supreme Court summarized this holding in *Averyt,* "If the deed reserves a fraction of the minerals under the land *conveyed*, then the deed reserves a fraction of the part of the mineral estate actually owned by the grantor and conveyed in the deed." [Emphasis in original]. *Averyt*, 717 S.W.2d at 893, *citing and discussing Hooks*, 21 S.W.2d at 532.

The rules established in *King* and *Hooks* have been consistently applied by Texas courts. *See*, *e.g.*, *Gibson v. Turner*, 156 Tex. 289, 294 S.W.2d 781, 784 (1956); *Winegar*, 304 S.W.3d at 667; and *Dowda v. Hayman*, 221 S.W.2d 1016, 1018 (Tex.Civ.App.--Fort Worth 1949, writ ref'd). And all of them are fundamentally different from the case at bar.

The classic *King/Hooks* scenario involves a reservation clause that attempts to define the scope of a reserved interest through an abbreviated or "shorthand" reference to a description of land *appearing elsewhere* in the deed. *Winegar*, 304 S.W.3d at 663, 667. That is not the case here. The Assignment contains an exacting, "longhand" description of the interest that Ferguson reserved. From this detailed language, it is clear that a production payment of a specified duration has been reserved in favor of Ferguson and his successors. It is equally unambiguous that there is a precise, fractional equation by which the production payment is to be measured: 1/16 of 35/64 of 7/8 of production. Additionally, the genesis of the fractional equation is explained. The first fractional component of the equation, 1/16, represents the amount of the interest that the assignor has reserved from the working interest he has conveyed. The second and third fractional components--35/64 of 7/8--together represent the total working interest that

7

has been conveyed through the assignment of the leases. Lastly, it is unambiguous that the entire fractional equation (1/16 of 35/64 of 7/8) is to be calculated against the total production of oil and other minerals "from each and both of said Surveys 36 and 37." Unlike *King* and *Hooks*, there is no need to look outside of the reservation clause to determine what was reserved.[4]

Further underscoring the inapplicability of *King* and *Hooks* is McDaniel's repeated insistence that the production payment must be calculated against "100% of the oil and gas produced from the land (*i.e.*, each and both of Surveys 36 and 37)." Whereas the very essence of *King* was a debate about whether a fractional interest should be applied against the entirety of a described tract of land, there is no such debate here. While Apache disagrees with McDaniel about what the fractional equation should be, it nonetheless agrees that the equation must be calculated against the entirety of Surveys 36 and 37. The only remaining question, then, is whether the terms of the Assignment permit a reduction of the production payment in the event any of the assigned leases expire.

### THE FOUR CORNERS OF THE ASSIGNMENT

McDaniel contends that there is no language within the four corners of the Assignment providing for a reduction of the production payment in the event of a partial lease failure. The parties primarily disagree about the purpose and effect of certain language contained in a parenthetical within the Assignment's reservation clause. That language explains the origin of the fractional equation:

> (1/16th of 35/64ths of 7/8ths, being one sixteenth of the entire interest in the production from said lands to which Assignor claims to be entitled under the terms of said respective oil and gas leases.)

McDaniel argues that the parenthetical is not part of the operative language reserving the

---

[4] *King*, 192 S.W.2d at 261-63; *Hooks*, 21 S.W.2d at 538; *Averyt*, 717 S.W.2d at 893; *Middleton*, 504 S.W.2d at 843; *Gibson*, 294 S.W.2d at 784; *Winegar*, 304 S.W.3d at 667; *Dowda*, 221 S.W.2d at 1018; *R. Lacy, Inc.*, 214 S.W.2d at 693-94.

production payment, but that it was instead "included simply as an explanatory provision." Apache concedes that the language of the parenthetical is explanatory in nature, but argues that the parenthetical explains how to calculate the production payment at any particular time, based upon the amount of working interest that is then attributable to the underlying leases. Apache further contends that McDaniel's interpretation renders the parenthetical meaningless.

Undeniably, the parenthetical establishes that the working interest conveyed is 35/64 of 7/8. This is apparent when the parenthetical is read in conjunction with other portions of the Assignment, such as its reference to "the thirty-five sixty-fourths of seven-eighths working interest hereby transferred." Additionally, the warranty clause provides the fractional interest of the mineral estate underlying Surveys 36 and 37 that is attributable to each of the individual leases.[5] We agree that while all of the information necessary to determine a reduction of the production payment in the event of a lease termination is present within the four corners of the Assignment, there is no express language providing for a piecemeal reduction of the production payment. "[C]ourts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco Inc. v. Enterprise Products Co.*, 925 S.W.2d 640, 646 (Tex. 1996).

Contrary to Apache's arguments, interpreting the parenthetical to be an explanation of the basis of the production payment calculation does not render it meaningless. It defines Ferguson's interest at the time of execution, as well as the relationship of his interest to those of the individuals entitled to a 1/8 landowner's royalty. The parenthetical's explanation of the fractional calculation is further meaningful in that supports and clarifies the warranty clause. By

---

[5] The third fraction in the equation, 7/8, is what remains after the fee simple owners of the mineral estate are afforded their 1/8 royalty. As the Supreme Court held in *King*, "as a matter of judicial knowledge, we know" that the "usual and customary one-eighth royalty reserved by the landowner" is "one-eighth of the oil and gas produced from land as a whole." *King*, 192 S.W.2d at 262.

cross-referencing the two, the reader can be assured that there is no discrepancy between the size of the grant and the size of the reservation. One need not look any further than *King* and *Hooks* for an illustration of the confusion that can result when such details are not specified. *King*, 192 S.W.2d at 260-63; *Hooks*, 21 S.W.2d at 534-40.

Apache emphasizes that if the production payment were not intended to be proportionately reduced in the event a lease expires, there would have been no need for the parties to include covenants requiring the assignees to pay delay rentals or comply with the covenants in the underlying leases. But the covenants are not lease-specific. Instead, they apply to the "leases" in general. The expiration of the two Cowden leases does not make it unnecessary for the assignee to comply with the covenants contained within the Peterman and Broudy leases. Moreover, in the event all four of the leases failed (a situation not before us), there would be no remaining obligation under the Assignment for any party. As the record stands, however, consideration of the production payment does exist, and there is no contractual language providing for a partial reduction. There is no language through which the production payment's specified sum ($3,550,000) or volumetric total (1,420,000 barrels of oil) can even conceivably be adjusted in the event of a lease termination. If Ferguson and Tyson had intended to periodically adjust the production payment, the Assignment surely would have included language providing for the adjustment of these significant numbers.

**THE NATURE OF PRODUCTION PAYMENTS**

Contending that McDaniel's construction of the Assignment ignores the fundamental nature of a production payment, Apache suggests such an interpretation leads to an unreasonable or absurd result. A court should construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and "avoid when possible and proper a

10

construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987); *Reliance Insurance Co. v. Hibdon*, 333 S.W.3d 364, 369 (Tex.App.--Houston [14th Dist.] 2011, pet. denied).

A production payment, sometimes referred to as an oil payment, is a share of the oil or other minerals "produced from the described premises, free of costs of production, terminating when a given volume of production has been paid over, or when a specified sum from the sale of such oil has been realized." *Alamo National Bank v. Hurd*, 485 S.W.2d 335, 340 (Tex.Civ.App.--San Antonio 1972, writ ref'd n.r.e.). Production payments have the same basic characteristics as an overriding royalty, except that a production payment is limited in duration. *Id.* While there is not an abundance of Texas authority construing the nature of production payments, it is well settled that an "oil and gas lease is a contract, and its terms are interpreted as such." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). We are aware of no Texas case deciding whether a production payment (absent express contractual language or otherwise) can be proportionately reduced following the expiration of some but not all of the leases. Certain legal scholars have opined that if a leasehold estate terminates, the production payment interest expires with it. A.W. Walker, Jr., *Oil Payments,* 20 TEX. L. REV. 259, 270 (1942); Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law* § 422.3(f) (5th ed. 2012). But we are unaware of any treatises that further particularize this issue to facts that resemble those present here and the parties have not provided us with any.

Apache advised us during oral argument that we will be turning oil and gas law on its head if we hold in McDaniel's favor. Its arguments relate to effects on revenue and are based entirely upon the trial testimony of Apache's land man supervisor, Thomas McCray Sloan. Since Sloan's testimony is outside of the four corners of the contract, the parol evidence rule bars

it from consideration.  *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008).

Apache's other arguments pertaining to the nature of a production payment interest are similarly

based upon the opinion testimony of its legal expert, Robert Stevens.   This evidence is likewise

barred by the parol evidence rule.  In sum, Apache has not demonstrated that the fundamental

nature of a production payment mandates the reduction of such a payment following a partial

lease failure in the absence of contractual terms so providing.

## CONCLUSION

We sustain Issue One and reverse and render judgment in favor of McDaniel.  We

remand the case to the trial court for calculation of attorney's fees owed by Apache to

McDaniel, as well as calculation of damages owed by Apache to McDaniel.

March 28, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

12