**APACHE DEEPWATER, LLC, Petitioner,**

v.

**MCDANIEL PARTNERS, LTD., Respondent.**

NO. 14–0546.

Supreme Court of Texas.

Argued October 14, 2015

Opinion delivered: February 26, 2016

Rehearing Denied May 6, 2016

Bruce M. Kramer, McGinnis Lochridge, Houston, LaDawn H. Conway, Alexander Dubose Jefferson & Townsend LLP, Dallas, Rachel Anne Ekery, Alexander Dubose Jefferson & Townsend LLP, Austin, Max E. Wright, Hinkle, Hensley, Shanor & Martin, L.L.P., Midland, Roger D. Townsend, Alexander Dubose Jefferson & Townsend LLP, Houston, for Petitioner.

Barry F. Cannaday, Dentons US LLP, Dallas, Deborah G. Hankinson, Rebecca Adams Cavner, William Richard Thompson II, Hankinson LLP, Dallas, for Respondent.

Nancy Hahn Elliott, Thomas A. Zabel, Zabel * Freeman, Houston, for Amicus Curiae.

JUSTICE DEVINE, delivered the opinion of the Court.

At issue in this case is how to calculate a production payment reserved in the assignment of four oil and gas leaseholds. The four leases were assigned in one instrument. After two of the leases terminated, a dispute arose over the production payment's calculation. The payor asserted the production payment should be reduced to reflect the loss of the underlying mineral-lease interests. The payee disagreed, asserting the production payment burdened the four leases jointly and the assignment included no language authorizing an adjustment to the payment.

The trial court concluded the production payment could be adjusted to account for the termination of an underlying lease because the payment was carved respectively from the four leases. The court of appeals disagreed. 441 S.W.3d 530, 531 (Tex. App.—El Paso 2014). It concluded (1) the assignment fixed the production payment at a stated percentage of the cumulative working interest assigned under the four leases, (2) the assignment provided no mechanism for reducing that payment if one or more of the underlying leases expired, and (3) the fixed payment endured so long as production continued under at least one of the assigned leases. *Id.* at 536–37. Because we agree with the trial court's construction of the assignment as allowing for the production payment's adjustment based on the expiration of an underlying lease, we reverse and render.

I

The assignment at issue dates back to 1953. In it, Hugh W. Ferguson, Jr., as-

signed to L.H. Tyson four oil and gas leases Ferguson owned in Upton County, Texas. The four leases included the Peterman, the Broudy, and two Cowden Leases. Cowden Lease 36 was entirely within Survey 36; Cowden Lease 37 was entirely within Survey 37. The Peterman and Broudy Leases covered both Surveys 36 and 37. The Peterman and Broudy also included additional acreage outside these two surveys, but the Peterman and Broudy Leases were assigned to Tyson only insofar as they covered Surveys 36 and 37.

At the time of the assignment, the four leases represented a 35/64 mineral interest in the two surveys, derived from the respective leases as follows:

| | |
|---|---|
| **Cowden Lease, Survey 36:** | 1/2 of Survey 36 |
| **Cowden Lease, Survey 37:** | 1/2 of Survey 37 |
| **Peterman Lease:** | 1/64 of Surveys 36 and 37 |
| **Broudy Lease:** | 2/64 of Surveys 36 and 37 |

The two Cowden Leases thus comprised 32/64 of the working interest in Surveys 36 and 37, the Peterman and Broudy Leases adding another 3/64. The leases also reserved a 1/8 royalty to the lessors, leaving the operator a 7/8 working interest in the two surveys.

The assignment reserved to Ferguson a 1/16 production payment, which it described with the following equation: "1/16th of 35/64ths of 7/8ths" of the total production from Surveys 36 and 37.[1] This descriptive equation included the fractional interest in production reserved from the conveyance (1/16); the fraction of the mineral estate within Surveys 36 and 37 conveyed in 1953 under the four leases (35/64); and the fraction representing the leasehold estate after subtracting the lessors' 1/8 royalty interest (7/8). The assignment provided further that the production payment would continue until net proceeds from the reserved interest amounted to $3.55 million and 1.42 million barrels of oil.

About twenty years after Ferguson assigned the four leases, both Cowden Leases expired for lack of production. Production on acreage outside of Surveys 36 and 37, however, perpetuated the Peterman and Broudy Leases. These two leases were still held by production in 2009 when Apache, as Tyson's successor-in-interest, acquired its interest under the Ferguson assignment. Because production under the Cowden Leases had ceased long before, the 3/64 mineral interest attributable to the Peterman and Broudy Leases were

1. The assignment provides in pertinent part:

 Assignor reserves unto himself, his heirs, representatives and assigns, and there is expressly excepted from this conveyance as a "production payment interest," the title to and ownership of one-sixteenth of thirty-five sixty-fourths of seven-eighths (1/16th of 35/64ths of 7/8ths, being one-sixteenth of the entire interest in the production from said lands to which Assignor claims to be entitled under the terms of said respective oil and gas leases) of the total oil, gas, casinghead gas and other minerals in and under and which may be produced from the above described land, i.e., from each and both of said Surveys 36 and 37 until the net proceeds of said reserved interest in the production ... shall have amounted in the aggregate to [$3,550,000.00 and 1,420,000 barrels of oil].

the only interests that Apache acquired subject to the assignment. Apache, however, acquired additional leases in Surveys 36 and 37 that were not subject to the assignment, completed additional wells, and began production in the two surveys.

After obtaining production, Apache sent a division order to Ferguson's successor-in-interest, McDaniel Partners, Ltd., stating that the production payment reserved in the 1953 assignment should now be 1/16 of 3/64 of 7/8, reflecting the expiration of the Cowden Leases. McDaniel disagreed and instead requested a new division order reflecting a production payment calculated under the assignment's original equation. When Apache paid McDaniel for the 3/64 interest instead of the assignment's original 35/64 interest, McDaniel sued.

After a bench trial, the trial court rendered a take-nothing judgment against McDaniel, issuing findings of fact and conclusions of law at McDaniel's request. The court held that the production payment was reserved from the four leases separately and "was thus subject to extinguishment upon expiration of each lease to the extent it existed as a burden against the production attributable to that lease." The court concluded further that Apache's division order, which provided for a production payment of 1/16 of 3/64 of 7/8, correctly reflected the production payment that remained after the 32/64 interest attributable to the former Cowden Leases was extinguished. McDaniel appealed, and the court of appeals reversed the trial court's judgment.

The appellate court held the assignment did not authorize Apache to adjust the production-payment equation to reflect the effect of an expired lease on the assigned interests. 441 S.W.3d at 536–37. The court reasoned that, even though the production payment was reserved out of the working interest conveyed and lease termi-

nations effectively reduced that working interest, no adjustment could be made to the production payment's stated equation because the assignment did not contemplate such an adjustment. *See Id.* at 536 (finding in the assignment "no express language providing for a piecemeal reduction of the production payment"). Having concluded that McDaniel was entitled to 1/16 of 35/64 of 7/8 of production and had thus been underpaid, the court remanded the case to the trial court to calculate McDaniel's damages and attorney's fees. *Id.* at 538. Apache appealed to this Court, where the dispute over the assignment's meaning remains the central issue.

## II

■ The focus of that dispute concerns the percentage that should be used to calculate the production payment. McDaniel contends the correct percentage is approximately 3% of production from the two surveys. McDaniel derives this figure from the equation the assignment uses to describe the production payment, that being "1/16th of 35/64th of 7/8th [of the total oil and gas] which may be produced from the above described land, i.e., from each and both of said Surveys 36 and 37." Because this equation states the production payment as a percentage of the cumulative working interests conveyed (35/64) and is used throughout the agreement, McDaniel views it as indicative of the parties' intent to burden the individual leases jointly with a production payment based upon the original, cumulative working interest conveyed. McDaniel thus interprets the assignment to reserve a fixed production payment of 1/16 of 35/64 of 7/8, which amounts to a payment of about 3% of production from the two surveys without regard to the termination of some of the underlying leases.

Apache, on the other hand, reads the assignment as tying the production payment to the extant working interest rather than to the working interest that was originally conveyed in 1953. Apache finds this evident from the assignment's explanation of the production-payment · equation: "1/16th of 35/64ths of 7/8ths, being one-sixteenth of the entire interest in the production from said lands to which Assignor claims to be entitled under the terms of said respective oil and gas leases." Apache submits that this language acknowledges that the production payment consists of 1/16 of the 7/8 working interest from each of the four leases, which in the aggregate amounted to 35/64 of the leasehold estate of Surveys 36 and 37 at the time of the assignment, but which is now only a 3/64 interest. In particular, Apache emphasizes that the word "respective" recognizes the separate nature of each lease, and the respective burden of the production payment on each. Noting further that the phrase "entire interest in the production" is an active explanation, rather than a passive description of the interest at the time of conveyance, Apache concludes that the language essentially describes how to derive the production payment at any point in time based on the practical effect of the production payment's burden on each individual lease. Because termination of the Cowden Leases reduced the assigned working interest from 35/64 to 3/64, Apache asserts that the production payment was correspondingly reduced to 1/16 of 3/64 of 7/8, or about 0.26% of production from the two surveys.

■■■ Although the parties have different views about calculating the production payment, they do not contend the assignment creating the interest is ambiguous. The parties' conflicting interpretations, without more, do not create an ambiguity. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Instead, ambiguity exists when an agreement's meaning is uncertain or its terms are reasonably susceptible to more than one interpretation. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex.2009). When an agreement can be given a definite or certain legal meaning, it is not ambiguous and is construed as a matter of law. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex.2001). The courts below found the assignment here to be unambiguous, and we agree.

The court of appeals, agreeing with McDaniel's interpretation, concluded that the assignment fixed the production-payment equation at 1/16 of the original working interest conveyed (35/64), burdening the leases jointly and continuing so long as any of the four leases remained in effect. 441 S.W.3d at 536–37. The court, however, also agreed in principle with Apache that the assignment contained "all of the information necessary to determine a reduction of the production payment in the event of a lease termination." *Id.* at 536. The court nevertheless concluded that the production-payment equation could not be proportionately adjusted based on an individual lease's expiration because the assignment did not expressly provide for "a piecemeal reduction." *Id.* The court was thus unwilling to adjust the production-payment's stated equation to reflect the loss of any part of the assigned interest absent a proportionate-reduction clause or similar provision in the agreement.

Apache argues that the inherent nature of the production payment reserved in this agreement affected the adjustment as a matter of course, rendering a proportionate-reduction clause superfluous. In fact, Apache submits that had the parties intended for the production-payment calculation to be unaffected by the termination of

an underlying lease, an express savings clause or similar provision would have been necessary. Apache further submits that the court of appeals inverted the analysis by concluding that the original fractional basis for the production payment continued unless the assignment specifically said it terminated when, instead, the interest terminated because the assignment did not expressly say that it survived. Apache's argument thus rests on its understanding of the nature and operation of the production payment reserved in the assignment.

The court of appeals analyzed the production payment as though it were an overriding-royalty interest. *See Id.* at 537 (noting that "[p]roduction payments have the same basic characteristics as an overriding royalty"). For purposes of this case, we agree that no meaningful difference exists between the two.

 A production payment, sometimes referred to as an "oil payment" when so limited, is a share of production from described premises, free of production costs at the surface, terminating when a given production volume has been paid or when a specified sum from its sale has been realized. 2 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, OIL & GAS LAW § 422 (2015). Production payments may be created from different estates and in a variety of ways. *See* 5 EUGENE O. KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 63 (2015) (discussing production payment variations and dividing them generally into two categories, the "lien" type and the "title" type, for purposes of discussion). When, as in this case, the production payment is carved from the lessee's working interest, it is like an overriding-royalty interest, except for its more limited duration. *Alamo Nat'l*

*Bank v. Hurd,* 485 S.W.2d 335, 340 (Tex. Civ.App.—San Antonio 1972, writ ref'd n.r.e.). And, like an overriding royalty, "anything that terminates the lease necessarily destroys the [production] payment." A.W. Walker, Jr., *Oil Payments,* 20 TEX. L. REV. 259, 288 (1942). Thus, in the case of a single lease, an overriding royalty (and by analogy a production payment) will not survive termination of the leasehold it burdens unless the parties have expressly agreed otherwise. *See Sunac Petroleum Corp. v. Parkes,* 416 S.W.2d 798, 804 (Tex. 1967) ("Normally, when an oil and gas lease terminates, the overriding royalty created in an assignment of the lease is likewise extinguished."); *see also Keese v. Cont'l Pipe Line Co.,* 235 F.2d 386, 388 n.3 (5th Cir.1956) (collecting Texas cases); 2 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL & GAS § 2.4[B][3], at 2–66 (2d. ed. 2015) ("Because an overriding royalty is created from the lessee's interest, it will not outlast the lease unless there is an express savings clause ...") (internal footnotes omitted).

Although the court of appeals appeared to accept that a production payment generally ends when the burdened leasehold terminates, the court was unaware of any authority extending that relationship to the present situation—a multi-lease assignment in which only some of the leases remained in effect. 441 S.W.3d at 537. Analogizing this situation to that of a partial-lease failure, the court concluded that "Apache has not demonstrated that the fundamental nature of a production payment mandates the reduction of such a payment following a partial lease failure in the absence of contractual terms so providing." *Id.* at 538.

Apache submits that the court's analogy of its circumstances to that of a partial-

lease failure, while not entirely accurate,[2] nonetheless supports Apache's construction of the assignment because, when a portion of leased acreage is released back to the lessor, overriding-royalty interests terminate as to the portion released. *See SM Energy Co. v. Sutton,* 376 S.W.3d 787, 791 (Tex.App.—San Antonio 2012, pet. denied); *Wagner v. Sheets & Walton Drilling Co.,* 359 S.W.2d 543, 544–46 (Tex.Civ. App.—Eastland 1962, writ ref'd n.r.e.); *Fain & McGaha v. Biesel,* 331 S.W.2d 346, 347–48 (Tex.Civ.App.—Fort Worth 1960, writ ref'd n.r.e.). Apache argues that the principle underlying these holdings—that an overriding-royalty interest terminates as to a surrendered portion of a leasehold estate—applies with even greater force here because two separate leasehold estates entirely expired.

The court of appeals nevertheless concluded that the production payment could not be reduced because the assignment failed to include "express language providing for a piecemeal reduction of the production payment." 441 S.W.3d at 536. The court thought such a clause necessary because the assignment provided no mechanism "through which the production payment's specified sum ($3,550,000) or volumetric total (1,420,000 barrels of oil) can even conceivably be adjusted in the event of a lease termination." *Id.* at 537. It thus concluded that, had the parties "intended to periodically adjust the production payment, the Assignment surely would have included language providing for the adjustment of these significant numbers." *Id.* at 537.

While we agree that the assignment fixed the dollars and volume of oil reserved to the assignor from production on the two surveys, we do not agree that this necessarily informs the rate at which it was to be delivered to the assignor's account, which is the gist of Apache's complaint here. This production payment has two parts: (1) the fractional share of production that Apache must pay, and (2) the total amount of money and production that is to be received before the interest terminates. Apache concedes the agreement fixes this latter part. Apache does not dispute that the production payment is to continue until a cumulative $3.55 million and 1.42 million barrels of oil are realized under the four leases assigned, two of which remain in effect. It argues, however, that the 1/16 production payment was reserved from the working interest of each individual lease and, as a result, the production-payment share attributable to the Cowden Leases was extinguished when the leases expired, affecting the first part of the reserved payment—that is, the fractional share of production to be paid.

 Ultimately, the nature of this particular production payment and its burden on the underlying leasehold estates rests on what the assignment says, not on what a party argues it should have said. When a contract's meaning is unambiguous, our task is to determine the parties' intentions as expressed in the written instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006). Our approach is holistic. *Hysaw v. Dawkins,* 483 S.W.3d 1, 8 (Tex.2016). We "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). No single provision taken alone is controlling, but rather all provisions are "considered with reference to the whole instrument." *Id.* Moreover, we "construe a contract from a utilitarian standpoint,

**2.** Apache observes that the Cowden Leases did not partially fail; they totally failed.

bearing in mind the particular business activity sought to be served." *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996).

The assignment clearly conveys four oil and gas leases out of two surveys in Upton County, describing them individually:

1. Cowden Lease—covering Survey 36

2. Cowden Lease—covering Survey 37

3. Peterman Lease—insofar only as it covers Surveys 36 and 37

4. Broudy Lease—insofar only as it covers Surveys 36 and 37

The warranty clause states that the conveyance includes half of the mineral interest in Surveys 36 and 37 under the Cowden Leases, another 1/64 interest in the two surveys under the Peterman Lease, and a 2/64 interest under the Broudy Lease—cumulatively the 35/64 interest originally conveyed. From this conveyance, the assignor reserves and excepts a "production payment interest" of 1/16 of the entire production from Surveys 36 and 37 to which the assignor is entitled under the four respective oil and gas leases. These respective interests are incorporated into the equation that the assignment employs in the reservation clause, using the following language:

Assignor reserves ... as a "production payment interest," the title to and ownership of one-sixteenth of thirty-five sixty-fourths of seven-eighths (**1/16th of 35/64ths of 7/8ths,** being one-sixteenth of the entire interest in the production from said lands to which Assignor claims to be entitled under the terms of said respective oil and gas leases) of the total oil, gas, casinghead gas and other minerals in and under and which may be produced from the above described land,

i.e., from each and both of said Surveys 36 and 37 ...

(emphasis added).

McDaniel interprets these words to reserve the production payment from the conveyance as a whole, binding all of the assigned leases jointly. McDaniel's interpretation thus separates this reservation from the individual leases, arguing that "the production-payment interest was carved out of the conveyance, not the leases, and was payable out of total production from the lands, not the leases."

But the assignor here did not convey the "lands" in 1953. Rather, he conveyed what he owned—the four leasehold estates identified in the assignment. From that conveyance, he reserved a 1/16 production payment, which the assignment clearly ties to the assignor's interests in the respective leases—"being one-sixteenth of the entire interest in the production from said lands to which Assignor claims to be entitled under the terms of said respective oil and gas leases." McDaniel's interpretation incorrectly suggests the reservation of an interest unrelated to the determinable fee interests the assignor actually owned and purported to convey.

Neither the inclusion of the four leases in a single instrument nor the instrument's statement of the leases' cumulative working interest as a single fraction demonstrates that the parties intended the production payment to be carved from something other than the estates conveyed. To the contrary, the explanatory phrase that follows the stated fraction ties the 1/16 reservation to the assignor's interest in the "respective" leases, indicating that the reserved interest pertains to the particular leases separately. *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1004 (1984) (defining "respective" to mean particular or separate). The assignment neither states, implies, nor suggests that

the production payment would be unaffected by the termination of the leaseholds from which it was carved or, as McDaniel seems to suggest, shift its otherwise allocable burden to one or more of the remaining leases. Absent express language in the assignment to the contrary, we apply the general rule that "when an oil and gas lease terminates, the overriding royalty [or similar production payment] created in an assignment of the lease is likewise extinguished." *Sunac*, 416 S.W.2d at 804. Applying that rule to the unambiguous language of this assignment, we conclude that the trial court rendered the correct judgment in the case.

We accordingly reverse the court of appeals' judgment and render judgment that McDaniel Partners, Ltd., take nothing.