**Opinion issued December 8, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00694-CV

———————————

**IQBAL AKHTAR, Appellant**

**V.**

**LEAWOOD HOA, INC., Appellee**

---

**On Appeal from the County Civil Court at Law No. 2**
**Harris County, Texas**
**Trial Court Case No. 1053689**

---

## O P I N I O N

Leawood HOA, Inc. ("Leawood"), the homeowners' association for Leawood Condominiums, sued Iqbal Akhtar, owner of several Leawood Condominiums units, in justice court after Akhtar failed to pay an assessment for repairs of the property. The justice of the peace conducted a bench trial and found

Akhtar liable. Akhtar appealed to the county court, which conducted a de novo bench trial and found Akhtar liable, awarding Leawood its damages and attorney's fees. Akhtar now appeals, arguing that legally insufficient evidence supports the county court's judgment. We affirm.

## Background

Leawood Condominiums is a development in Harris County, Texas. Established in 1983, the development is governed by a declaration, pursuant to which it has also adopted a set of by-laws and additional rules and regulations. The declaration provides that, in the event of a conflict between the declaration and by-laws or other rules, the declaration prevails. Pursuant to the declaration, Leawood HOA was established in 1983 to administer the entire development in accordance with the declaration and by-laws.

Articles V and VI of the declaration give Leawood the power and, in some circumstances, obligation to make assessments against the owners of the condominium units. In particular, sections 5.1 and 5.6 through 5.11 set out the condominium owners' obligations to pay assessments and the mechanisms at Leawood's disposal for collection of the assessments. Section 5.3 provides for determination of assessments by Leawood's board of directors, stating,

> This determination may include, among other items, taxes, governmental assessments, landscaping and grounds care, Common Area lighting, repairs and renovation, garbage collections, wages, water charges, legal and accounting fees, management costs and fees,

2

expenses and liabilities incurred by the Association under or by reason of this Declaration, expenses incurred in the operation and maintenance of recreation and administrative facilities, payment of any deficit remaining from a previous period and the creation of a reserve contingency fund. The omission or failure of [Leawood's] Board to fix the assessment for any month shall not be deemed a waiver, modification or a release of the Owners from the obligation to pay.

Section 5.4 allows the board to adjust the regular monthly assessments, subject to approval by a vote of two thirds of the unit owners.

The declaration also provides for special assessments of various kinds. Section 5.5 governs "special assessment[s] applicable to [the calendar year when levied] only, for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, repair or replacement of improvements upon the Common Area," but requires a two-thirds vote of the unit owners approving such an assessment.

By contrast, Article VI governs "destruction or obsolescence of improvements," specifying the circumstances under which Leawood may, may not, or must make repairs to the development after it sustains damage. When the development is damaged, section 6.1(b) provides that any "repair and reconstruction . . . means restoring the improvement(s) to substantially the same condition in existence prior to the damage, with each Unit and Common Elements having the same vertical and horizontal boundaries as before." That section also provides,

(1)     In the event of damage or destruction due to fire or other disaster, the insurance proceeds, if sufficient to reconstruct the improvement(s), shall be applied by the Association, as Attorney In Fact, to such reconstruction, and the improvement(s) shall be promptly repaired and reconstructed.

(2)     If the insurance proceeds are insufficient to repair and reconstruct the improvement(s), and if such damage is not more than sixty-six and two-thirds percent (66-2/3%) of all the Common Elements, not including land, such damage or destruction shall be promptly repaired and reconstructed by the Association, as Attorney In Fact, using the proceeds of insurance and the proceeds of an assessment to be made against all of the Owners and their Condominium Units.   Such deficiency assessment shall be a special assessment made pro rata according to each Owner's proportionate interest in and to the Common Elements and shall be due and payable within thirty (30) days after written notice thereof.   The Association shall have the authority to cause the repair or restoration of the improvements using all of the insurance proceeds for such purpose notwithstanding the failure of an Owner to pay the assessment.

Akhtar owns six units in the development, of which five are at issue in this appeal.   From approximately 2008 to 2010, Akhtar served for one year as Leawood's president, then for another year as its vice president.

In September 2008, Hurricane Ike made landfall in the Houston area and damaged the condominium development.   In particular, it damaged what the declaration defines as "Common Elements," including the roofs, gutters, and siding on multiple buildings.   Ultimately, Leawood determined that the roof of every building at the development needed to be replaced.

4

The development held an insurance policy for hurricane damage, with a deductible of $500,000, which is two percent of the insured value of the development. At the time that Ike damaged the development, Leawood did not have any contingency reserve fund. Although the declaration required Leawood to maintain such a reserve, prior boards had spent down the available funds to zero.

Leawood pursued claims against its insurance and recovered approximately $326,000, from which it paid attorney's fees and management fees. As a result, Leawood had a net recovery in its litigation of approximately $185,000. The cost to repair the roofs, gutters, siding, and other building damage, however, was approximately $600,000. Leawood's board determined that the $500,000 deductible under its insurance policy "must be paid before the actual work to repair the Unit Homeowners' roof damage can begin." It also determined to increase the contingency reserve of the development from zero to $85,000, leaving only $100,000 of its insurance recovery available for repairs.

On November 15, 2012, Leawood sent a letter to all unit owners in the development, captioned, "Notice of Special Assessment to All Individual Homeowners of Leawood HOA." In the letter, Leawood explained its position that a "Special Assessment for each Unit Homeowner[] due to the Hurricane Ike damage must be assessed." As support for this action, the letter quoted from the definition of the term "Special Assessments" in section 1.1, subparagraph (s), of

the Leawood Condominiums declaration. The letter explained that each unit was being assessed $1,201 and gave homeowners two options—one monthly, one a lump sum—for payment.

On February 6, 2013, Leawood sent a second letter, stating that the first letter contained "an error in our terminology and its calculation" and explaining that the assessment was not a "special assessment" as defined in the declaration, but an assessment to recover the insurance deductible. It also set the amount of the assessment at different rates depending on the size of each unit, rather than at $1,201 for each unit.

Leawood repaired the Hurricane Ike damage, and at least 99 percent of the unit owners paid their assessments. Akhtar, however, refused to pay the assessments on the grounds that the assessments were not approved by a two-thirds vote at a meeting of the homeowners. Leawood sued Akhtar in justice court to recover the assessment on each unit, attorney's fees, late fees, unpaid work orders, association dues, and other miscellaneous unpaid fees and charges related to its attempts to collect the assessments. The justice court conducted a bench trial and rendered judgment for Leawood.

Akhtar appealed to the county court. Although he had not asserted any affirmative defenses in the justice court, on appeal he contended that Leawood had breached its obligations under the declaration by failing to conduct a vote before

levying the assessment. According to Akhtar, Leawood's failure to hold a vote made the assessment invalid and excused his failure to pay.

The county court conducted a bench trial. Werner Weiss, current president and board member of Leawood, testified regarding the assessment, the development's insurance coverage and deductible, and the procedures that Leawood followed in making the assessment. Counsel for Leawood testified regarding Leawood's attorney's fees. Finally, Akhtar testified about his own experience as a Leawood officer and board member and about his interpretation of the declaration. The county court found for Leawood, awarding it $6,120 for the unpaid assessments, court costs, and attorney's fees of $7,500.

## Discussion

In his sole issue on appeal, Akhtar contends that the evidence is legally insufficient to support the county court's judgment. He argues that the declaration required Leawood to conduct a vote at a meeting of the development's unit owners and obtain a two-thirds vote approving any assessment. He also contends that, if the judgment cannot stand on a breach of contract theory, it also cannot stand on a theory of unjust enrichment.

## A. Standard of Review

When a party challenges the legal sufficiency of the evidence supporting a judgment, the reviewing court must look at all of the evidence admitted and

7

determine whether, after disregarding all evidence that a reasonable trier-of-fact could disregard, more than a scintilla of evidence supports the judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005). Evidence is legally insufficient if the record reveals the "complete absence of evidence of a vital fact"; if the only evidence supporting a judgment is incompetent, such that a court cannot consider it; if "the evidence does not rise above a scintilla [such that] . . . [the factfinder] would have to guess whether a vital fact exists"; or if the evidence "conclusively establishes the opposite of a vital fact." *Id.* at 811–14. In conducting a legal-sufficiency analysis, we review all of the evidence in the light most favorable to the verdict. *Id.* at 822. Legal sufficiency of the evidence is a question of law, not of fact. *Estrada v. Cheshire*, 470 S.W.3d 109, 119 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *City of Keller*, 168 S.W.3d at 822).

## B. Applicable Law

Whether an agreement is ambiguous is a question of law for the court. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). The interpretation of an unambiguous contract is also a question of law for the court. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). Accordingly, we review disputes concerning the proper interpretation of unambiguous written agreements de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.

2002); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999). We review agreements governing a condominium development in accordance with the relevant provisions of the Property Code. Because Leawood Condominiums was created in 1983, it is governed by both the Condominium Act, Chapter 81 of the Property Code, which governs condominium regimes created before January 1, 1994, and the Uniform Condominium Act, Chapter 82 of the Property Code. *See* TEX. PROP. CODE §§ 81.0011(a) (applicability of Chapter 81 to condominium regimes created before Jan. 1, 1994), 81.0011(b) (Chapter 82 applies to regimes created before Jan. 1, 1994), 82.002(c) (specifying extent to which Chapter 82 applies to regimes created before Jan. 1, 1994).

Our primary goal when construing a written instrument is to ascertain the intentions of the parties as expressed in the instrument. *E.g.*, *Moayedi*, 438 S.W.3d at 7; *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 514 (Tex. 2014). We therefore examine a contract "as a whole in light of the circumstances present when the parties entered the agreement." *Pilarcik*, 966 S.W.2d at 478. We "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 906 (Tex. 2016) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)); *see Plains Expl. & Prod. Co. v. Torch Energy Advisors*

9

*Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). "No single provision taken alone is controlling, but rather all provisions are 'considered with reference to the whole instrument.'" *Apache Deepwater*, 485 S.W.3d at 906 (quoting *J.M. Davidson, Inc.*, 128 S.W.3d at 229); *see Plains Expl. & Prod.*, 473 S.W.3d at 305. "Moreover, we 'construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served.'" *Apache Deepwater*, 485 S.W.3d at 906–07 (quoting *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996)); *see Plains Expl. & Prod.*, 473 S.W.3d at 305. In so doing, we "give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense." *Plains Expl. & Prod.*, 473 S.W.3d at 305 (citing *Moayedi*, 438 S.W.3d at 7).

Interpreting an agreement containing words such as "may" and "shall" requires us to determine whether the words are intended as permissive or mandatory. Under well-settled Texas law, the common meaning of "may" is permissive, while the common meaning of "shall" is mandatory. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 525–26 (Tex. 2015) (collecting cases); *Dall. Cty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 873–74 (Tex. 2005). Likewise, when we interpret a statute, the Legislature has explicitly provided, "'May' creates discretionary authority or grants permission or a power," while "'Shall' imposes a duty," "unless the context in which the word or phrase

10

appears necessarily requires a different construction or unless a different construction is expressly provided by statute." Tex. Gov't Code § 311.016(1)–(2).

**C. Analysis**

To determine whether Leawood had authority to levy the assessment for the insurance deductible without a vote, we look first to the declaration. We need not consider the by-laws, as the declaration itself provides that the declaration controls over the development's by-laws in the event of any conflict between the documents, and the by-laws contain no relevant provisions. *See* Tex. Prop. Code § 82.053(c) ("If there is a conflict between the provisions of the declaration and the bylaws, the declaration prevails except to the extent the declaration is inconsistent with this chapter."). Under the parol evidence rule, we also cannot consider extrinsic evidence, such as the testimony of witnesses at trial regarding their interpretations of the declaration, to create an ambiguity in the declaration. *Plains Expl. & Prod.*, 473 S.W.3d at 305. We therefore disregard the testimony by Weiss and Akhtar to the extent that they offered interpretations of unambiguous language in the declaration.

Section 6.1(b)(2) of the declaration imposes a duty on Leawood to repair the common elements of the condominium development, such as roofs, after a "fire or other disaster" that damages or destroys less than sixty-six and two-thirds percent

11

of all of the common elements.  By contrast, for disaster damages greater than that threshold, section 6.1(b)(3) requires Leawood to terminate the condominium regime and sell the property unless the owners unanimously agree to repair it.  It is undisputed that the damage to common elements from Hurricane Ike, while significant, fell far short of that threshold.  Indeed, the insurance deductible of $500,000 represented two percent of the insured value of the development, yet the actual damage was only $600,000, or 2.2 percent of the insured value.  Accordingly, section 6.1(b)(2) of the declaration governs Leawood's conduct following the hurricane.

Section 6.1(b)(2) also imposes a duty to recover any deficiency in insurance proceeds after a disaster by means of an assessment against "all of the [condominium] Owners and their Condominium Units."  Critically, that subparagraph provides, "If the insurance proceeds are insufficient to repair and reconstruct the improvement(s) . . . such damage or destruction *shall* be promptly repaired and reconstructed by [Leawood], as Attorney in Fact . . . ."  (Emphasis added.)  It further provides that such repair and reconstruction shall be accomplished "using the proceeds of insurance and the proceeds of an assessment *to be made* against all of the Owners and their Condominium Units."  (Emphasis added.)  It requires that such a "deficiency assessment *shall* be a special assessment made pro rata according to each Owner's proportionate interest in and

12

to the Common Elements," and Leawood "*shall* have the authority to cause the repair or reconstruction of the improvements using all of the insurance proceeds for such purpose notwithstanding the failure of an Owner to pay the assessment." (Emphasis added.)

Taking these words at their common meaning, the declaration's uses of the word "shall" impose mandatory, rather than discretionary, duties on Leawood. *See G.T. Leach Builders*, 458 S.W.3d at 525–26; *Dall. Cty. Cmty. Coll. Dist.*, 185 S.W.3d at 873–74. Thus, Leawood had no discretion regarding whether or not to repair the common elements, nor did it have any discretion as to how to pay for such repairs. Rather, the declaration requires Leawood first to use the insurance proceeds, then to cover any shortfall in those proceeds by means of "an assessment *to be made* against all of the Owners and their Condominium Units." (Emphasis added.) Further, how to collect that assessment is not discretionary; it is to be "made pro rata according to each Owner's proportionate interest in and to the Common Elements."

Article VI makes an assessment mandatory in the event of a disaster requiring repair or reconstruction for which insurance proceeds are insufficient. Because Leawood has no discretion in such a scenario as to whether to levy the assessment or how to apportion it among the unit owners, Article VI does not require approval of the unit owners. Further, the total amount of the assessment

13

does not require approval, as it is simply the amount of the shortfall, a sum necessarily fixed by the circumstances. The owners, by purchasing units and voluntarily subjecting themselves to the declaration, have already bound themselves by the declaration and conferred upon Leawood the authority to fulfill its duties mandated by the declaration. *See* TEX. PROP. CODE §§ 82.003(11) (condominium regime is defined by declaration), 82.051(a) (declaration is recorded instrument essential to creation of condominium regime).

Our interpretation is consistent with the applicable statutory law. Section 81.206 of the Property Code provides, in relevant part, that "if a building in a condominium regime is damaged by a casualty against which it is insured, the proceeds of the insurance policy *shall* be used to reconstruct the building." TEX. PROP. CODE § 81.206(a) (emphasis added). It thus imposes upon Leawood a duty to repair the property. *See* TEX. GOV'T CODE § 311.016(1)–(2). And Section 81.207(a) provides, in relevant part,

> If under Section 81.206 a damaged building in a condominium regime must be reconstructed but insurance proceeds are insufficient to pay for the cost of reconstruction, the [unit] owners directly affected by the damage *shall* pay the difference between the cost of reconstruction and the insurance proceeds . . . . Each affected [unit] owner *shall* contribute an amount for reconstruction that is proportionate to the interest of the [unit] owner in the condominium regime.

TEX. PROP. CODE § 81.207(a) (emphasis added); *see also id.* § 82.111(i) (providing that costs of insured repairs in excess of insurance proceeds are common expense

14

of unit owners and permitting board to levy assessment to pay such expenses). It is undisputed that Akhtar's building was affected by the damage and that he received a benefit from the repairs to the condominium development. Indeed, Weiss testified that, after the hurricane, every building at the complex received a new roof, and all of the damaged gutters and siding were repaired. Accordingly, the Property Code also required Akhtar to pay his proportionate share of the repairs.

Akhtar has not addressed Article VI at all, either in the county court or in his brief before this Court. Rather, he bases his argument on Article V, which applies to permissive assessments. Under Article V, Leawood "*may* levy in any calendar year a special assessment applicable to that year only, for the purpose of defraying . . . the cost of any construction or reconstruction, repair or replacement of improvements . . . ." (Emphasis added.) Such an assessment "*shall* be approved by a two-thirds (2/3) vote of the quorum of Owners." (Emphasis added.) Thus, Article V governs only permissive assessments, to be made at Leawood's discretion, while mandating procedures to be followed when levying such assessments. Akhtar's interpretation of the declaration, in which Article V and not Article VI governs this dispute, makes the requirements of section 6.1(b)(2) superfluous, as Leawood would have no power to fulfill its duties without first obtaining approval to do so.

Akhtar does not argue that the calculation of the assessment was incorrect, that Leawood did not levy the assessment for a proper purpose, or that legally insufficient evidence supports the amount of the damages awarded to Leawood. Instead, he argues only that the assessment was invalid in the absence of an approving vote by the unit owners. But the declaration, interpreted as a whole and in light of the Property Code, required Leawood to repair the property after Hurricane Ike and impose an assessment to collect the insurance deficiency incurred due to those repairs. Both the declaration and applicable statutes fixed the amount of the assessment—the amount of the deficiency—and the proration of that assessment. Neither the declaration nor the applicable statutes require a vote approving the assessment. The circumstances left nothing discretionary to be approved.

We note that the county court did not base its holding on an analysis of Article VI. The county court reasoned that Leawood collected the insurance deficiency assessment in accordance with sections 5.2, 5.3, and 5.4 of the declaration, and Akhtar was therefore obligated to pay the assessment. But an erroneous conclusion of law does not require reversal if the county court nonetheless rendered the proper judgment. *See Estrada*, 470 S.W.3d at 119 (citing *BMC Software*, 83 S.W.3d at 794); *see also* TEX. R. APP. P. 44.1 (prohibiting reversal for errors of law "unless the court of appeals concludes that the error . . .

16

probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals").

We hold that legally sufficient evidence supported the county court's judgment that Akhtar breached his obligations under the declaration and that Leawood was entitled to levy and collect the insurance deficiency assessment without a vote. We therefore do not reach Akhtar's arguments regarding unjust enrichment. We overrule Akhtar's sole issue.

## Conclusion

We affirm the judgment of the county court.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.