**Reversed and Remanded in part, Affirmed in part, and Opinion Filed December 17, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00001-CV**

**ANDREA ARNOLD, Appellant**
**V.**
**RANDY ADDISON, RANDY DENTON, DON MAULSBY, PATRICIA BROWN, ROBERT J. BRUNS, GUY DIXON, AND CAMBRIDGE PLACE AT PRESTON TRAIL HOMEOWNERS ASSOCIATION, Appellees**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-04121-2018**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Carlyle
Opinion by Justice Partida-Kipness

Appellant Andrea Arnold appeals from a final judgment dismissing her claims against her neighborhood homeowners' association and certain past and current association officers. In four issues, Arnold contends the trial court erred in denying her motions for summary judgment, granting appellees' motions to dismiss her declaratory judgment claims, granting appellees' motion for summary judgment on her remaining claims, and awarding attorney's fees to appellees. We reverse the trial court's judgment in part and affirm the remainder.

# BACKGROUND

Arnold's claims arose from actions taken by officers of the Cambridge Place at Preston Trail Homeowners Association (the Association) regarding the passage of amended restrictive covenants and bylaws and the interpretation and enforcement of the prior restrictive covenants. Cambridge Place at Preston Trail (Cambridge Place) is a neighborhood of 121 homes located in a subdivision straddling the border between Dallas and Collin counties. Membership in the Association is mandatory for all homeowners in Cambridge Place. Arnold moved into Cambridge Place in 1998.

In 2013, the Association began considering changes to its governing documents. At the time, the Association was governed by a Declaration of Covenants, Conditions, and Restrictions established in 1995 (1995 DCCRs) and bylaws established in 2004 (2004 Bylaws). In August 2016, Association officers Randy Addison, Randy Denton, Don Maulsby, and Patricia Brown began distributing proposed amended DCCRs and bylaws (Amended DCCRs) to the members. The Association board notified the members that a vote on the Amended DCCRs was scheduled for the annual meeting on February 22, 2017. The notice included a proxy form by which the members could vote on the Amended DCCRs by proxy through the Association's secretary, Mary Chaffin. The notice included an additional proxy form by which members could appoint a proxy to vote on all other ballot items. Relevant to the issues on appeal, the notice informed members that their

proxies "will help fulfill the quorum requirements" and the meeting would have to be rescheduled if "the quorum of homeowners is not present in person or by proxy." The second proxy form also asked members who were unable to attend the meeting to "mail, fax, or email" their proxy to the Association's management company "[i]n order to meet the quorum requirements." Both proxy forms also stated that the proxy vote would not be counted unless the form was received before the meeting on February 22, 2017.

As planned, the Association held its annual meeting on February 22, 2017. With a quorum of members present, the vote on the Amended DCCRs was taken. Seventy-six members voted for the amendments and fifteen members voted against. However, Chaffin, the proxy holder, was not at the meeting. Then-president, Addison, indicated the board was aware of proxies in Chaffin's possession. Thus, Addison proposed extending the voting period to allow Chaffin to present the proxy votes at a later special meeting. A motion to adjourn the meeting was made and seconded, and the members in attendance voted to adjourn the meeting.

The Association reconvened on March 8, 2017, to count the proxy votes. The final tally was eighty-four votes for the amendments and fifteen votes against. The approval percentage was 69%—above the 67% required to approve the Amended DCCRs. *See* TEX. PROP. CODE § 209.0041(h) ("a declaration may be amended only by a vote of 67 percent of the total votes allocated to property owners entitled to vote on the amendment of the declaration" unless the declaration permits approval by less

than that amount). The Association has been operating under the Amended DCCRs since the vote.

Arnold took issue with the means by which the vote was taken and the board's interpretation of certain provisions of the 1995 DCCRs. Specifically, she contended that the 1995 DCCRs and 2004 Bylaws did not permit the members to adjourn the annual meeting and continue the vote. She also contended that the board had misinterpreted the 1995 DCCRs regarding approval of property repairs and charged capital assessments above the 1995 DCCRs' cap on such assessments. Arnold filed the instant lawsuit to address these concerns.

Arnold filed suit on August 15, 2018, against current and past officers Addison, Denton, Maulsby, Brown, Robert J. Bruns, and Guy Dixon. Arnold alleged the defendants had breached the Association's governing documents and violated the Texas Residential Property Owners Protection Act (TRPOPA) and chapter 22 of the Texas Business Organizations Code. Arnold also sought a declaration that the 1995 DCCRs were still in force because the vote counted at the annual meeting was insufficient to adopt the Amended DCCRs, and the members had no authority to continue the vote. The individual defendants moved to dismiss Arnold's claims under rule of civil procedure 91a. According to the individual defendants, they were immune from Arnold's claims under federal and state statutes protecting volunteers; the TRPOPA does not provide a private right of action against fellow Association members; Arnold failed to plead the existence of a contract between herself and the

–4–

individual defendants; and Arnold could only bring her declaratory judgment action against the Association, which was not a party to the lawsuit. The parties later limited the motions to Arnold's declaratory judgment action. The trial court granted the individual defendants' motions and dismissed Arnold's declaratory judgment action against the individual defendants.

Arnold filed an amended petition, adding the Association as a defendant. The Association filed a counterclaim seeking a declaration that the Amended DCCRs were valid and enforceable because the vote was properly conducted. Arnold and the Association filed cross-motions for summary judgment on the declaratory judgment claims. The trial court denied Arnold's motion and granted the Association's motion.

Appellees then moved for traditional and no-evidence summary judgment on Arnold's remaining claims. Among the grounds for dismissal of Arnold's claims, the individual appellees asserted an immunity defense. Arnold responded and filed a motion for summary judgment on her claim that the individual defendants breached the 1995 DCCRs by imposing capital assessments above the capped amount and requiring approval of repairs to homeowners' property. Arnold also argued that the defendants were not immune because they knowingly violated the 1995 DCCRs. The trial court granted appellees' motion and denied Arnold's motion.

Appellees filed a motion for entry of judgment and attorney's fees. Six days later, the trial court entered judgment and awarded appellees attorney's fees. Arnold

filed a motion for new trial in which she asserted that the trial court erred in granting appellees' motion before she had a chance to respond and that no evidence had been admitted to support the attorney's fees award. Arnold attached her counteraffidavit regarding appellees' fee request to the motion. Arnold also requested findings of fact and conclusions of law. The trial court issued findings of fact and conclusions of law regarding only the attorney's fees award. Arnold's motion for a new trial was overruled by operation of law, and this appeal followed.

## ANALYSIS

In four issues, Arnold contends the trial court erred in denying her motions for summary judgment, granting the individual appellees' motions to dismiss, granting appellees' motion for summary judgment on Arnold's non-declaratory claims, and awarding attorney's fees. We address each issue in turn.

### A. Arnold's Motions for Summary Judgment

The parties filed cross-motions for summary judgment on Arnold's declaratory judgment action and her claims that the individual appellees breached the 1995 DCCRs by imposing improper capital assessments and requiring approval of property repairs. The trial court denied Arnold's motions and granted appellees' motions. Arnold contends the trial court erred in denying her motions. Generally, a denial of a summary judgment is not reviewable on appeal. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996); *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 724 (Tex. App.—Dallas 2015, no pet.). A denial is reviewable, however, when

"both sides moved for summary judgment on the same issues and the trial court granted one motion for summary judgment and denied the other." *Clark*, 460 S.W.3d at 724. Here, both sides moved for summary judgment on all of Arnold's claims. When reviewing the trial court's judgment on the parties' cross-motions for summary judgment, we "determine all questions presented and render the judgment that the trial court should have rendered." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018).

We review a summary judgment de novo. *Tex. Workforce Comm'n v. Wichita Cty.*, 548 S.W.3d 489, 492 (Tex. 2018). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017).

A defendant who conclusively negates at least one of the essential elements of a cause of action or conclusively proves each element of an affirmative defense is entitled to summary judgment. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008) (per curiam); *see* TEX. R. CIV. P. 166a(b), (c). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See*

*MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986); *Affordable Motor Co., Inc. v. LNA, LLC*, 351 S.W.3d 515, 519 (Tex. App.—Dallas 2011, pet. denied); TEX. R. CIV. P. 166a(a), (c). To conclusively establish a fact, "the evidence must leave 'no room for ordinary minds to differ as to the conclusion to be drawn from it.'" *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982)); *Affordable Motor Co.*, 351 S.W.3d at 519. If the movant conclusively proves each element of its claim or affirmative defense, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018).

### 1. The Vote

As discussed above, the vote on the Amended DCCRs was taken during two meetings: the February 22, 2017 annual meeting and the March 8, 2017 special meeting. Arnold contends the 1995 DCCRs did not permit the Association to conduct a vote in this way. She specifically contends that the quorum present at the February 22, 2017 meeting did not have authority under the 1995 DCCRs to adjourn the meeting; a quorum was not present at the March 8, 2017 special meeting; and questions presented to a quorum of members in one meeting may not be carried over to a subsequent meeting.

Arnold's contentions require us to review the trial court's interpretation of the 1995 DCCRs. We review a trial court's interpretation of a restrictive covenant de

novo. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 279 (Tex. 2018). "[R]estrictive covenants are subject to the general rules of contract construction." *Id*. at 280 (quoting *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998)). Like a contract, a restrictive covenant is unambiguous as a matter of law if it can be given "a definite or certain legal meaning." *Id*. (quoting *Pilarcik*, 966 S.W.2d at 478). "Mere disagreement over the interpretation of a restrictive covenant does not render it ambiguous." *Id*. (quoting *Buckner v. Lakes of Somerset Homeowners Ass'n, Inc.*, 133 S.W.3d 294, 297 (Tex. App.—Fort Worth 2004, pet. denied)).

"A paramount concern when construing covenants is giving effect to the objective intent of the drafters of the restrictive covenant as it is reflected in the language chosen." *Id*. Thus, we examine the covenant as a whole in light of the circumstances present when the parties entered into the agreement, giving the words used in the covenant the meaning they commonly held when the covenant was written. *Id*. (citing *Pilarcik*, 966 S.W.2d at 478, and *Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex. 1987)). When construing a covenant, a court must not enlarge, extend, stretch, or change the covenant's words, and it must avoid any "construction that nullifies a restrictive covenant provision." *Id*. (quoting *Pilarcik*, 966 S.W.2d at 479).

"For a subsequent instrument to amend original restrictive covenants, the instrument creating the original restrictions must establish both the right to amend

such restrictions and the method of amendment." *Syx v. LTG Vegan Ltd.*, No. 05-05-00854-CV, 2006 WL 2077567, at *2 (Tex. App.—Dallas July 27, 2006, pet. denied) (mem. op.) (citing *Scoville v. SpringPark Homeowner's Ass'n, Inc.*, 784 S.W.2d 498, 504 (Tex. App.—Dallas 1990, writ denied)). "To be effective, the amendments must be made in the precise manner provided for in the original instrument." *Id.* (citing *Youssefzadeh v. Brown*, 131 S.W.3d 641, 645 (Tex. App.—Fort Worth 2004, no writ), and concluding purported amendments were not effective because they were not made during the times allotted for such amendments by the restrictive covenants).

Arnold contends the Amended DCCRs were never adopted because they were not "approved in the precise manner provided in the [1995 DCCRs]." Section 9.2 of the 1995 DCCRs permits amendment "upon the express written consent of at least seventy percent (70%) of the outstanding votes of each membership class of the Association." The parties agree, however, that this requirement is limited by section 209.0041(h) of the property code, which permits amendment "by a vote of 67 percent of the total votes allocated to property owners entitled to vote on the amendment of the declaration" and overrides declarations requiring a higher percentage. TEX. PROP. CODE § 209.0041(h).[1] Thus, the Amended DCCRs could only become effective if

---

[1] This subsection applies only to declarations requiring a vote of more than 67%, such as the 1995 DCCRs. *See* TEX. PROP. CODE §§ 209.0041(h-1) (permitting amendment by less than 67% if the declaration allows), 209.0041(h-2) (requiring a vote of 67% of "the lots subject to the declaration" if the declaration is silent as to voting rights for amendment).

67% of the Association's members voted for them. Although appellees contend the amendments passed with 69% of the vote, Arnold contends they failed because the vote was improperly conducted.

To support her argument, Arnold cites three provisions of the 2004 Bylaws: Section 2.04 addressing quorums, section 2.05 addressing proxies, and section 2.06 addressing meeting adjournment. Section 2.06 states:

> When a quorum is present at any meeting of the Association, a majority by Members present, in person or by proxy, at such meeting shall decide any question brought before such meeting unless the question is one upon which, by express provisions of the Declaration or the By-Laws, a different vote is required, in which case such express provision shall govern and control a vote on such question.

According to Arnold, section 2.06's use of the word "shall" required the members at the February 22, 2017 meeting to decide the "question" of the Amended DCCRs. Arnold relies on case law recognizing "shall" as "creating a duty or obligation." *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001); *Charlton v. State*, 334 S.W.3d 5, 10 (Tex. App.—Dallas 2008, no pet.); *Filmstrips & Slides, Inc. v. Dallas Cent. Appraisal Dist.*, 806 S.W.2d 289, 290–91 (Tex. App.—Dallas 1991, no writ); *Akhtar v. Leawood Hoa, Inc.*, 508 S.W.3d 758, 765 (Tex. App.—Houston [1st Dist.] 2016, no pet.). By its own terms, however, section 2.06 applies only to "questions" requiring only a majority of members to decide. As previously discussed, amendments to the Association's governing documents required more than a simple majority. Thus, by its own terms, section 2.06 did not control the vote on the Amended DCCRs.

–11–

Even if section 2.06 controlled, it would not preclude the members from continuing the vote, as Arnold contends. According to Arnold, the section's use of the word "shall" "creates a duty or obligation on Members at a meeting at which there is a quorum present to '***decide*** any question brought before such meeting.'" In other words, the members *must* decide any question presented at the meeting. This interpretation is inconsistent with the cited precedent concluding that "shall" does not always create a duty or obligation and that actions taken in contravention of any such duty or obligation are not necessarily void. *See Helena Chem. Co.*, 47 S.W.3d at 493 ("shall" is "only directory when this interpretation is most consistent with the Legislature's intent"); *Charlton*, 334 S.W.3d at 11 (statute stating that a court "shall" sign an agreed child support review order within three days after the order is filed with the district clerk does not render void an order signed after three days). Moreover, Arnold's interpretation would result in absurdity. *See Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626–27 (Tex. 2011) ("[U]nder general rules of construction we avoid strictly construing an instrument's language if it would lead to absurd results."). For example, should a majority of the members present at a meeting abstain from voting on a "question" presented, the members would be in violation of section 2.06 under Arnold's interpretation because the majority *must* decide the question. To the contrary, the plain language of the provision merely states that "questions" not addressed by other provisions of the 1995 DCCRs will be decided by a majority vote. *See Tarr*, 556 S.W.3d at 280 (when interpreting a

covenant, we give the words the meaning they commonly held when the covenant was written).

Arnold further contends that the members could not vote to adjourn the February 22, 2017 meeting because the 1995 DCCRs "do not allow adjourning a vote," and authority to adjourn a meeting is granted only to a non-quorum under section 2.04. That section requires 30% of the "votes of all Lots" to constitute a quorum and states that if a quorum is not present at any meeting, "the Members present or represented by proxy shall have the power to adjourn and reconvene the meeting . . . until a quorum shall be present or represented." According to Arnold, this language grants the authority to adjourn a meeting only to a non-quorum because the 1995 DCCRs contain no other language granting authority to adjourn a meeting, and section 2.06 requires members to decide all "questions" presented if a quorum exists. As previously discussed, however, section 2.06 does not apply to the vote at issue and Arnold's interpretation of section 2.06 is incorrect.

Regardless, the plain language of section 2.04 does not prevent a quorum of members from adjourning a meeting. Indeed, it does not even mention any authority granted to a quorum. Rather, the section's plain language merely states the percentage of members required to constitute a quorum and grants a non-quorum of members a limited authority they would not otherwise have, namely the authority to adjourn a meeting and reconvene when a quorum is present. *See Tarr*, 556 S.W.3d at 280. Arnold has not directed us to any language in the 1995 DCCRs, and we have

found none, indicating that the right to adjourn a meeting is restricted to a non-quorum of members.

Arnold contends that even if the members could adjourn the meeting, there was not a quorum at the March 8, 2017 special meeting. Thus, the vote taken at that meeting was invalid. Arnold cites the minutes of the special meeting to show that there were only eighteen members physically present, which is well below the number required to make a quorum. As noted in the proxy forms and supported by the 2004 Bylaws, however, proxies are counted when determining whether a quorum is present for a vote. Specifically, the 2004 Bylaws state that members "may be present at any meeting of the Association and may act at such meeting either in person or by proxy." The proxy forms echoed this rule by notifying the members that their proxy forms must be received before the meeting to fulfill the quorum requirements. This admonishment is consistent with section 2.05's requirement that "[p]roxies must be filed with the Secretary of the Board at or before the appointed time of each meeting of the Association." When the proxies are included, the minutes of the special meeting reflect that at least ninety-nine members were present. This is well above the 30% required to make a quorum. The minutes also reflect that eighty-four members—approximately 69%—voted for the Amended DCCRs. This exceeds the 67% required to pass the Amended DCCRs. *See* TEX. PROP. CODE § 209.0041(h). Accordingly, based on the record before us, we conclude the Amended DCCRs were properly approved by the Association's members.

## 2. Capital Assessments

Arnold next contends that the individual appellees breached the 1995 DCCRs by imposing capital assessments above the amount permitted. Appellees contend that the assessments in question were considered maintenance assessments before the enactment of the Amended DCCRs, and the 1995 DCCRs had no cap on maintenance assessments.

Section 7.1 of the 1995 DCCRs required each member to pay "annual maintenance assessments or charges ('Maintenance Assessments')" and "special assessments for capital improvements ('Capital Assessments')." Section 7.4 stated that Maintenance Assessments were intended to "maintain the Common Properties within reasonable standards." This section also required the board to "set the amount of the Maintenance Assessment that may be levied against each Lot for the succeeding year," limiting increases in the Maintenance Assessment to 10% above the prior year's assessment, unless approved by the members. In contrast, section 7.5 stated that Capital Assessments were intended to "defray[] . . . the cost of any construction or reconstruction, unexpected repair or replacement of a capital improvement upon the Properties or Common Properties . . . ." This section also capped Capital Assessments at $25,000 per year, unless approved by the members.

According to Arnold, she produced summary-judgment evidence that the board began exceeding the annual $25,000 cap on Capital Assessments in 2011. In support of her motion for summary judgment on her breach-of-covenant claim,

Arnold produced the 1995 DCCRs, board member correspondence, and the board's 2005 resolution establishing a Replacement Fund and Replacement Fund Operating Policy, which Brown referenced in January 2018 correspondence with Arnold. On appeal, Arnold cites Brown's January 2018 correspondence in which Brown noted the Association had been "collecting $26,015 annually since 2011" and that dues collected for the "replacement fund" were intended to pay for "future major repairs and replacements of the Common Area Elements of our HOA." Arnold also cites the minutes of a November 2010 board meeting in which the board increased "assessment attributable to the Replacement and Major Repair Fund" from "$190 to $215 per home." Appellees contend these "replacement fund" assessments were not Capital Assessments, but Maintenance Assessments. We disagree.

In 2005, the board adopted a resolution to create a Replacement Fund and related Operating Policy to pay for "major repairs and replacements of common area site improvements" or "common property components" (the 2005 Resolution). The intent was to accumulate funds for such major expenses so that "current rather than future owners [are charged] with the cost of the current use of assets . . . ." The 2005 Resolution also funded the Replacement Fund by transferring assets designated, at the time, "for future major repairs to *capital assets*." (emphasis added). The Replacement Fund Operating Policy identified the Association's "common property" as "streets, sidewalks, perimeter walls, entrance gates and mechanisms, gate house, greenbelt, street lighting and related *capital assets*." (emphasis added).

–16–

The policy also expressly stated that maintenance expenditures could not be paid from the Replacement Fund.

> Expenditures for major repairs and replacements of common area site improvements detailed in Exhibit C of the Reserve Fund Study (as periodically updated) shall be expensed in the replacement fund.
>
> . . . .
>
> Expenditures for routine maintenance and repairs, inspection and service fees, maintenance contracts and other items, which are not contemplated in Exhibit C of the Reserve Fund Study (as periodically updated), shall be charged against expense in the operating fund. Replacing minor parts, lubricating and adjusting equipment, repainting, and cleaning are examples of maintenance charges that occur regularly and are treated as ordinary operating fund expenses. These items are generally replaced in small, low-cost increments.

By echoing the 1995 DCCRs' reference to "repair and replacement of a capital improvement upon . . . Common Properties" and expressly excluding maintenance expenditures, the language of the 2005 Resolution and the Replacement Fund Operating Policy reflects an intent to treat the Replacement Fund assessments as Capital Assessments. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764 (Tex. 2018) ("We . . . interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." (internal citation omitted)).

Other evidence offered in support of Arnold's summary-judgment motion further supports this conclusion. Specifically, Arnold cited minutes from a November 9, 2010 board meeting in which the board voted to raise the "Replacement and Major Repair Fund" assessment from $190 to $215 per home. Brown recognized

–17–

this increase in her January 2018 correspondence, stating that the 2010 dues increase resulted in the Association "collecting $26,015 annually since 2011." Addressing the pending 2018 dues increase, Brown confirmed the assessment was intended to fulfill the Replacement Fund Operating Policy by "keeping special assessments to a minimum so we can avoid large assessments." She also acknowledged the dues increase addressed increased "capital costs."

Arnold offered an October 16, 2017 memorandum from Dixon to the board that also recognized the 2010 dues increase made "the annual assessment . . . $26,015 [$215 per household x 121 households]." Dixon further noted, "Traditionally, modifications to Replacement Fund revenue via *capital assessment* adjustments were considered coincident with each 5-year Reserve Study." (emphasis added). The Replacement Fund Operating Policy required the board to make adjustments to annual Replacement Fund contributions based on this periodic Reserve Study, which assessed the "normal and remaining useful lives of the components" of "each major element of common property."

Relevant to Arnold's claim that the board did not obtain member approval to exceed the Capital Assessment cap, Dixon stated in his 2017 memorandum, "The magnitude of such adjustments had been at the sole discretion of the Board. Now, however, the new governing documents limit the Board's authority to an assessment adjustment of 15% from the prior year, without homeowner approval." This

statement is in direct contrast to section 7.5 of the 1995 DCCRs requiring the board to obtain member approval to exceed the Capital Assessment cap.

In sum, the 2005 Resolution reflects an intent to provide funding for the repair and replacement of the Association's capital assets through Capital Assessments. Other evidence offered by Arnold supports this conclusion by directly addressing such assessments as Capital Assessments. Based on the record before us, we conclude the Replacement Fund assessments predating the enactment of the Amended DCCRs were Capital Assessments and there is evidence that such assessments imposed after 2010 exceeded the $25,000 cap dictated in the 1995 DCCRs. Accordingly, we sustain Arnold's first issue with respect to her claim that appellees breached the 1995 DCCRs by exceeding the cap on Capital Assessments.

Arnold asserted in her summary-judgment motion that she was entitled to $41.95 in damages. This amount, however, was predicated on improper Capital Assessments "through 2018." In light of our determination that the Association has been properly operating under the Amended DCCRs since March 8, 2017, fact issues remain as to damages.

### 3. Repair Approval

Arnold also moved for summary judgment seeking to enjoin the individual appellees from requiring approval of repairs to homeowners' properties. Arnold contends that the individual appellees violated the 1995 DCCRs by misinterpreting

"repairs" as "alterations" requiring approval.[2] Relying on section 8.4 of the 1995 DCCRs, addressing repairs to existing homes, Arnold contends that repairs do not require approval because they "must be consistent with the conditions in place when the improvement was first approved." Contrary to Arnold's assertion, however, section 8.4 does not *require* repairs to be made in accord with initial conditions. Accordingly, it does not support her contention that repairs are exempt from approval.

Under the heading "Nonconforming and Unapproved Improvements," section 8.4 describes the board's discretion to require an owner to restore improvements to "the condition existing prior to the construction thereof" if they were not made according to the 1995 DCCRs' specifications. Recognizing that the specifications may have changed since the improvements were originally constructed, section 8.4 permits repair in accord with prior specifications.

> Dwellings or other improvements constructed initially in accordance with these Covenants and Restrictions and having received any necessary approval of the Architectural Control Committee in connection with their initial construction, *may be* repaired, maintained and restored in accordance with the standards in force at the time of their initial construction, notwithstanding any subsequent amendment or revision of these Covenants and Restrictions or of the Architectural Guidelines. (emphasis added).

---

[2] In her August 27, 2019 motion for summary judgment, Arnold sought to enjoin the individual appellees from enforcing the repair policy through the Amended DCCRs' enforcement mechanism. Although she sought to prevent enforcement through the Amended DCCRs, she alleged that the individual appellees' repair policy violated only the 1995 DCCRs. She made no similar allegation as to the Amended DCCRs.

In contrast, if improvements are "totally destroyed or totally replaced," the "new improvements *must* conform to the Covenants and Restrictions and the Architectural Guidelines in force at the time of their construction." (emphasis added). Thus, contrary to Arnold's contention, section 8.4 does not *require* repairs to be made in accord with the initial standards, but merely permits repairs to be so made. Moreover, there is no language in this provision exempting any repair from approval.

Regardless, Arnold contends that requiring approval of repairs exceeds the board's discretionary authority. We will uphold the discretionary authority exercised by a property owner's association unless we determine "by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory." TEX. PROP. CODE § 202.004(a). In her motion for summary judgment, Arnold asserted the Association's requiring approval of repairs is "not a discretionary act entitled to a presumption of reasonableness" but a "clear violation" of section 8.4. However, she cited no authority to support this assertion.

Article VIII of the 1995 DCCRs established an Architectural Control Committee (ACC) to promulgate Architectural Guidelines "in keeping with the overall quality, general architectural style and design of the community." The article also granted the ACC "the authority to make final decisions in interpreting the general intent, effect and purpose of those matters for which it is responsible in accordance with these Covenants and Restrictions." Regarding approval, the article stated that "[n]o building, structure, paving, pools, fencing, hot tubs or improvement

of any nature shall be erected, placed or altered" without approval by the ACC as to, among other things, "conformity and harmony of external design, color, and texture with existing structures and existing landscaping," "quality of materials," and "the other standards set forth within this Declaration or the Architectural Guidelines."

Arnold contends the ACC's "authority extends to *new* construction and improvements—not *completed* construction and improvements that a homeowner merely repairs, maintains, or restores." As noted, however, the ACC is responsible for approving alterations. This necessarily means the ACC's authority is not restricted to "*new* construction and improvements," as Arnold contends. *See Alter*, Merriam-Webster, https://www.merriam-webster.com/dictionary/alter (last visited on Nov. 8, 2021) (defining "alter" as "to change (something)"). Arnold also asserts that "as long as a homeowner is not changing a structure (read altering) but simply maintaining what has already been approved (read repairing) the ACC has no authority to review and approve such work." Arnold does not direct us to any provision other than section 8.4 to support the contention that the ACC has no authority to review and approve repairs, and we have found none. And section 8.4 contains no such restriction.

In light of the ACC's authority to preserve "the overall quality, general architectural style and design of the community," coupled with the permissive section 8.4 merely allowing, but not requiring, owners to make repairs in accord with initial standards, the board's decision to require approval of repairs is reasonable and

not arbitrary, capricious, or discriminatory. *See* TEX. PROP. CODE § 202.004(a) (requiring courts to uphold association's discretionary authority unless exercised arbitrarily, capriciously, or discriminatorily). Additionally, appellees offered declarations of Addison, Brown, Bruns, and Maulsby in which each affiant attested that during his or her tenure on the board, the Architectural Control Guidelines had always been interpreted to require "approval to complete architectural repairs to the exterior of . . . homes if the repairs are visible from the greenbelt, common areas, sidewalks, streets or alleys." Arnold did not contest or object to these statements. Accordingly, we overrule Arnold's first issue as to the board's interpretation of the 1995 DCCRs to require approval of repairs.

On the record before us, we overrule Arnold's first issue as to her declaratory judgment action regarding the validity of the vote on the Amended DCCRs and her claim the individual appellees violated the 1995 DCCRs by requiring approval of repairs. We sustain her first issue as to her claim that the board violated the 1995 DCCRs by exceeding the cap for Capital Assessments imposed from 2011 to 2017.

**B.    Appellees' Motions to Dismiss Arnold's Declaratory Judgment Action**

In her second issue, Arnold contends the trial court erred in dismissing her declaratory judgment claim. The individual appellees moved to dismiss her declaratory judgment claim under rule of civil procedure 91a.[3] According to Arnold,

---

[3] The individual appellees filed two Rule 91a motions. The first motion was filed by Addison, Brown, Bruns, and Dixon. This motion sought to dismiss all of Arnold's claims on multiple grounds. At the hearing,

the motions were improper because "they were functionally pleas to the jurisdiction or motion for joinder of an indispensable party." Alternatively, Arnold contends the trial court erred because there was a justiciable controversy between herself and the individual appellees.

Under rule 91a, "a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1. "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." *Id*. "A cause of action has no basis in fact if no reasonable person could believe the facts pleaded." *Id*. "We review the merits of a Rule 91a ruling de novo; whether a defendant is entitled to dismissal under the facts alleged is a legal question." *In re Farmers Tex. Cty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021) (orig. proceeding).

Arnold contends that the individual appellees raised jurisdictional issues in their Rule 91a motions. According to Arnold, a party cannot use a Rule 91a motion to challenge the trial court's jurisdiction. She cites *City of Austin v. Liberty Mutual Insurance*, 431 S.W.3d 817, 822 (Tex. App.—Austin 2014, no pet.), in support of this assertion. However, the court in *Liberty Mutual* did not construe the Rule 91a motion as a plea to the jurisdiction because it raised a jurisdictional challenge.

---

the parties informed the trial court they had agreed to limit the motion to Arnold's claim for declaratory relief. The trial court granted the motion and dismissed only this claim. Denton and Maulsby were later served, answered, and filed a Rule 91a motion limited to Arnold's claim for declaratory relief. The trial court granted this motion. Accordingly, the only claim at issue in the Rule 91a motions was Arnold's claim for declaratory relief.

*Liberty Mut.*, 431 S.W.3d at 822 n.1. Rather, the court merely treated the motion as a plea to the jurisdiction on interlocutory appeal because interlocutory appeal is not permitted from denial of Rule 91a motion. *See id*. Indeed, a party may seek dismissal for lack of jurisdiction under rule 91a. *See Office of Attorney Gen. of Tex. v. Brickman*, No. 03-21-00161-CV, --- S.W.3d ---, 2021 WL 4897561, at *2 (Tex. App.—Austin Oct. 21, 2021, no pet. h.). Regardless, the individual appellees' motions did not raise jurisdictional issues as to Arnold's declaratory judgment claim.

Arnold contends in the alternative that the individual appellees' Rule 91a motions merely sought joinder of a necessary party: the Association. The absence of a necessary party will generally not merit dismissal but only prevent entry of judgment as to the remaining parties. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162–63 (Tex. 2004) (discussing the general principle and noting that section 37.006 of the Declaratory Judgments Act further protects rights of non-parties to the proceeding). Thus, if the Association were a necessary party, its absence would not merit dismissal of Arnold's declaratory judgment claim.

The individual appellees' Rule 91a motions asserted there was no basis in law or fact for Arnold's declaratory judgment action against the individual appellees. Although the motions noted that Arnold had not sued the Association, they did not argue that the Association was a necessary party. Rather, they argued that Arnold could bring her declaratory judgment action *only* against the Association. Specifically, the individual appellees asserted that "[a]ny claims relating to the

validity of the governing documents of the Association would amount to a controversy between members of the Association and the Association itself." Accordingly, the individual appellees asserted that Arnold could not maintain this action against them, and they moved to dismiss the claim. The motions contain no indication that the individual appellees treated the Association merely as a necessary party. Based on the record before us, we conclude the motions sought relief permitted under rule 91a. *See* TEX. R. CIV. P. 91a.1 (permitting a party to seek dismissal of a claim that has no basis in law or fact).

Arnold contends that even if the motions were proper under rule 91a, the trial court erred in granting the motions because her declaratory judgment claim against the individual appellees was valid. The Uniform Declaratory Judgments Act is intended "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b). A declaratory judgment is appropriate "only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 685 (Tex. 2020) (quoting *Bonham St. Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995)). A justiciable controversy requires a "real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Id*.

Arnold's declaratory judgment action specifically sought a declaration that "the Governing Documents, as they existed prior to the Defendants' purported

–26–

adoption of their Proposed Amendments, are valid, enforceable, and subsisting, and that the Proposed Amendments are not valid, enforceable, or subsisting." Essentially, Arnold sought a declaration that the Association was operating under invalid governing documents. She based this allegation on the individual appellees' alleged violation of the 1995 DCCRs. Thus, Arnold cites the 1995 DCCRs' enforcement provision as authority for her declaratory judgment claim. Section 9.3 of the 1995 DCCRs states that "[t]hese Covenants and Restrictions may be enforced against any person or persons violating or attempting to violate them." The trial court concluded, however, that this provision would allow a member to sue a neighbor for violating the DCCRs, but it would not support a claim that the Association is not operating under valid governing documents. Expounding on the relationship between the governing documents, the Association, and the members, the trial court noted, "[T]he amended CCRs that you are arguing about today . . . belong to the homeowners [sic] association. They don't belong to any of those individual members at all. . . . What you're asking this Court to do is to invalidate an entire group of CCRs owned by – that's not the proper legal term – but owned by the homeowners [sic] association." We agree.

The individual appellees asserted in their motions to dismiss, and on appeal, that Arnold's declaratory judgment claim could be brought only against the Association. They contend that the declaratory judgment sought by Arnold would not have resolved the dispute between her and the Association because it would be

–27–

enforceable only as to the individual defendants. Indeed, "all persons who have or claim any interest that would be affected by the declaration must be made parties," and "[a] declaration does not prejudice the rights of a person not a party to the proceeding." TEX. CIV. PRAC. & REM. CODE § 37.006(a). Thus, any declaratory judgment as to only the individual appellees would not have prevented the Association from continuing to operate under the Amended DCCRs. Several opinions from this Court and our sister courts confirm that a declaratory judgment action to invalidate either governing documents or actions taken by an association board pursuant to governing documents must be brought against the association, not individual board members. *See, e.g.*, *Simpson v. Oaks on Montfort Condo. Ass'n*, No. 05-19-00123-CV, 2021 WL 164449, at *2 (Tex. App.—Dallas Jan. 19, 2021, no pet.) (mem. op.) (request for declaratory judgment as to whether association had the right to enter a unit to perform repairs, and whether association had the right to charge fees for security to plaintiff's account); *Garden Oaks Maint. Org. v. Chang*, 542 S.W.3d 117, 126 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (homeowners filed counter-claim against association and its maintenance organization seeking declarations regarding "the invalidity of documents purportedly establishing [the organizations] under sections 201.005 and 204.006 of the Property Code and regarding the invalidity of [the maintenance organization's] by-laws"); *Storck v. Tres Lagos Prop. Owners Ass'n, Inc.*, 442 S.W.3d 730, 735–36 (Tex. App.—Texarkana 2014, pet. denied) (homeowner alleged association violated property

code and failed to hold proper board election because bylaws impermissibly restricted voting to members who were current on their dues); *Friedman v. Rozzlle*, No. 13-12-00779-CV, 2013 WL 6175318, at \*1 (Tex. App.—Corpus Christi-Edinburg Nov. 21, 2013, pet. denied) (mem. op.) (member sued association and members seeking declaration that short-term rental provision of association's governing documents was unenforceable because association had not prevented short-term rentals, association filed cross-claim seeking declaration as to whether it had duty to enforce the short-term rental provision). Accordingly, we conclude the trial court did not err in granting the individual appellees' motions to dismiss, and we overrule Arnold's second issue.

## C.   Officer Immunity

In her third issue, Arnold contends the trial court erred in granting appellees' motion for summary judgment on the individual appellees' affirmative defense of immunity because appellees did not move for summary judgment on and did not present evidence conclusively establishing their immunity defense. Alternatively, Arnold contends she raised a fact issue as to whether the individual appellees "knowingly and/or intentionally violated" and "knew or should have known" they were violating the 1995 DCCRs. Having sustained Arnold's first issue only with respect to her claim the individual appellees violated the 1995 DCCRs by exceeding the Capital Assessment cap, we limit our consideration of her third issue to that claim.

At the outset, we note that Arnold appears to argue on appeal that the individual appellees did not move for summary judgment on their immunity defense because they did not file a motion titled as such. "[W]e look to the substance of a motion to determine the relief sought, not merely to its title." *In re Estate of Hutchins*, 391 S.W.3d 578, 585 (Tex. App.—Dallas 2012, no pet.) (quoting *Surgitek, Bristol–Myers Corp. v. Abel*, 997 S.W.2d 598, 601 (Tex. 1999)). Accordingly, we will consider the substance of the appellees' motion for summary judgment to determine whether they moved for summary judgment on the individual appellees' immunity defense.

After the trial court granted appellees' motions for summary judgment as to Arnold's and the Association's declaratory judgment claims, appellees moved for traditional summary judgment on Arnold's remaining claims. The individual appellees asserted, among other grounds, that they were immune from Arnold's claims under both the federal Volunteer Protection Act of 1997 (VPA) and the Texas Charitable Immunity and Liability Act (TCILA).

The VPA protects volunteers of a nonprofit organization from liability "caused by an act or omission of the volunteer" if "the volunteer was acting within the scope of the volunteer's responsibilities in the nonprofit organization or governmental entity at the time of the act or omission." 42 U.S.C. § 14503(a). Likewise, the TCILA protects "a volunteer of a charitable organization" from liability "for any act or omission resulting in death, damage, or injury if the volunteer

was acting in the course and scope of the volunteer's duties or functions, including as an officer, director, or trustee within the organization." TEX. CIV. PRAC. & REM. CODE § 84.004(a). Neither statute, however, protects acts or omissions that are intentional, willful, or done with conscious indifference to the rights or safety of others.[4] 42 U.S.C. § 14503(a); TEX. CIV. PRAC. & REM. CODE § 84.007(a). Citing their declarations offered as evidence, the individual appellees argued they were immune from Arnold's claims because they "acted in good faith and in accordance with the governing documents in place at the time when exercising their duties as officers of the Association." Relevant to Arnold's capital-assessments claim, the individual appellees declared they "considered the financial needs of the Association and consulted the governing documents in place at the time the assessments were levied."

Arnold responded to the individual appellees' immunity defense, and argued the individual appellees were not immune "because violating the restrictive covenants of Cambridge Place is not within the scope of their responsibility to the Association." *See* 42 U.S.C. § 14503(a), TEX. CIV. PRAC. & REM. CODE § 84.004(a) (protecting volunteers for acts taken within the scope of their responsibilities). By this, Arnold would have us disregard the fact that the individual appellees took the

---

[4] The VPA specifically excludes "willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer." 42 U.S.C. § 14503(a)(3). The TCILA specifically excludes "an act or omission that is intentional, wilfully negligent, or done with conscious indifference or reckless disregard for the safety of others." TEX. CIV. PRAC. & REM. CODE § 84.007(a).

–31–

actions in question in their capacity as board members. We decline to do so. The 1995 DCCRs unequivocally grant authority to the board to manage the assessment process and funds collected. Accordingly, the individual appellees' actions in amending and imposing Capital Assessments were taken within the scope of their responsibilities as board members. Under both the VPA and the TCILA, the question is not merely whether a volunteer failed to fulfill his or her duties to the organization but whether he or she did so intentionally, willfully, or with conscious indifference. *See* 42 U.S.C. § 14503(a); TEX. CIV. PRAC. & REM. CODE § 84.007(a).

On appeal, Arnold contends the individual appellees' declarations were not competent summary judgment evidence because they were conclusory. She specifically takes issue with the declarations' contention that the board made all decisions during the declarant's tenure "in accordance with the governing documents in place at the time," that all decisions made by the declarant as an officer were "made in good faith," and that the declarant "exercised ordinary care in carrying out [his or her] duties as an officer." According to Arnold, these conclusory statements are not competent summary judgment evidence.

"A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Paragon Gen. Contractors, Inc. v. Larco Const., Inc.*, 227 S.W.3d 876, 883 (Tex. App.—Dallas 2007, no pet.). A conclusory affidavit does not raise fact issues and is not competent summary judgment evidence. *Id.*; TEX. R. CIV.

P. 166a(f) (affidavits "shall set forth such facts as would be admissible in evidence"). We agree with Arnold regarding the cited statements.

The declarations contain other statements, however, that are not conclusory and support appellees' summary-judgment motion. For example, Addison stated in his declaration, "Before any additional assessments were levied, the Board considered the financial needs of the Association and consulted the applicable restrictions in determining whether the assessment was permissible and whether the assessment needed to be presented to the Members for a vote." Addison also stated, "The determination to increase the annual Maintenance Assessment for 2014 was voted on and approved by the Board at the November 21, 2013 Board meeting.[5] The Board provided notice of the meeting to Members ten days prior to the meeting. The Board meeting, as always, was open to all Members." The other declarations contain similar statements. Additionally, appellees offered other documents, such as the 2005 Replacement Fund resolution and minutes of board meetings, containing evidence of the individual appellees' conduct while serving as officers.

Arnold contends on appeal that, even if the individual appellees met their summary-judgment burden, she produced evidence raising a fact issue as to whether the appellees "knowingly and/or intentionally" violated the 1995 DCCRs and "knew

[5] The minutes of this meeting reflect the board's approval of an "operating fund assessment" of $2,700 "per home" and "a replacement fund assessment of $215." Although appellees contend these assessments were Maintenance Assessments, we have concluded that the "replacement fund assessment" was a Capital Assessment.

or should have known" they were violating the 1995 DCCRs by exceeding the cap on Capital Assessments. Relevant to the Capital Assessments, Arnold cites only Dixon's October 16, 2017 memorandum regarding the Association's 2018 Operating and Replacement Fund Pre-Final Budget Proposal.[6] In this memorandum, Dixon notes that the 2011 adjustment to the Replacement Fund assessment took the annual assessment to $26,015. Dixon also notes that such adjustments had been made "via capital assessment adjustments . . . . at the sole discretion of the Board" under the 1995 DCCRs. As we previously concluded, Dixon's determination was incorrect. This fact alone, however, is no evidence that the individual appellees disregarded the 1995 DCCRs provisions intentionally, willfully, or with conscious disregard for the rights or safety of others when deciding to adjust the assessments. *See* 42 U.S.C. § 14503(a) (excluding from immunity, "willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer"); TEX. CIV. PRAC. & REM. CODE § 84.007(a) (excluding from immunity, "an act or omission that is intentional, wilfully negligent, or done with conscious indifference or reckless disregard for the safety of others"). Thus, Dixon's memorandum is insufficient to raise a fact issue as to whether the individual appellees violated the 1995 DCCRs intentionally, willfully, or with conscious disregard for the rights or safety of others.

---

[6] Having concluded that the trial court properly granted appellees' motion for summary judgment as to Arnold's other non-declaratory claims, we do not address evidence cited by Arnold regarding these other claims.

*See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (evidence insufficient to create a fact issue unless "reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented").

Based on the record before us, we conclude the individual appellees moved for and presented sufficient evidence supporting summary judgment on their immunity defenses, and Arnold failed to present sufficient evidence to raise a fact issue. *See Lujan*, 555 S.W.3d at 84. Accordingly, we overrule Arnold's third issue.

**D.    Attorney's Fees**

In her fourth issue, Arnold contends the trial court abused its discretion in awarding attorney's fees to appellees. Arnold specifically asserts she was denied due process when the trial court ruled on appellees' motion for attorney's fees before the deadline for her counteraffidavit; her counteraffidavit raised fact issues regarding appellees' evidence in support of their motion; appellees did not move for summary judgment on the fee amount; and appellees failed to produce legally sufficient evidence to support the trial court's fee award.

Generally, we review a trial court's award of attorney's fees for an abuse of discretion. *See Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004). Here, appellees sought attorney's fees under rule of civil procedure 91a and section 37.009 of the civil practice and remedies code. Under the version of rule 91a

applicable to Arnold's claims,[7] the trial court was required to award "all costs and reasonable and necessary attorney fees incurred." TEX. R. CIV. P. 91a .7, 76 Tex. B.J. 221, 222 (2013) (Tex. Sup. Ct. 2013, amended 2019). Section 37.009 of the civil practice and remedies code gives the trial court discretion in declaratory judgment actions to "award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. Arnold does not question the authority to award attorney's fees, but the trial court's procedure and appellees' proof.

As a preliminary matter, we address Arnold's contention that appellees' "motion for 'determination of fees'" did not constitute a motion for summary judgment as to the "amount of reasonable and necessary attorney's fees." According to Arnold, appellees' motion focused on proving the requested fees were "equitable and just," not "reasonable and necessary." As previously discussed, we look to the substance of the motion to determine the relief sought. *See In re Estate of Hutchins*, 391 S.W.3d at 585. The record reflects that appellees' motion specifically cited authority and evidence purportedly establishing appellees' right to recover reasonable and necessary attorney's fees and the amount of the fees sought.

---

[7] The current version of Rule 91a.7 provides that costs and attorney's fees "may" be awarded to the prevailing party. TEX. R. CIV. P. 91a.7. Rule 91a was amended on July 11, 2019. This amendment applies only to civil actions commenced on or after September 1, 2019. TEX. R. CIV. P. 91a 2019 cmt. Arnold filed her original petition on August 15, 2018. Accordingly, we will apply and cite the 2013 version of Rule 91a.7 in our discussion of this issue.

Accordingly, we conclude that appellees moved for summary judgment on the amount of reasonable and necessary attorney's fees. *See id*.

After the trial court issued its last order regarding the substantive claims at issue, appellees filed a motion on September 27, 2019, for entry of judgment and determination of attorney's fees. Appellees attached to the motion their counsel's affidavit and redacted billing statements. Six days later, on October 3, 2019, the trial court issued its final judgment that included an award of attorney's fees consistent with appellees' motion. Arnold requested findings of fact and conclusions of law on October 23, 2019, and filed her motion for new trial and attorney-fee counteraffidavit on October 28, 2019—thirty days after appellees moved for attorney's fees. The trial court issued findings of fact and conclusions of law regarding the award of attorney's fees on November 6, 2019. According to Arnold, the trial court erred in issuing its final judgment before she was required to file her counteraffidavit. We agree.

Arnold contends that section 18.001 of the civil practice and remedies code controls the deadline for filing a counteraffidavit to contest proof of services rendered. In civil cases not involving a suit on a sworn account, a party may prove that a service was reasonable and necessary by submitting an affidavit in compliance with civil practice and remedies code section 18.001. TEX. CIV. PRAC. & REM. CODE

§ 18.001.[8] A party intending to controvert such a claim must "must serve a copy of the counteraffidavit on each other party or the party's attorney of record" no later than "30 days after the day the party receives a copy of the affidavit." *Id*. § 18.001(e). The record reflects that the trial court issued its final judgment only six days after appellees filed and served their motion and fee affidavit. Additionally, in its orders on Denton's and Maulsby's motion to dismiss and the parties' cross-motions for summary judgment on the claims for declaratory relief, the trial court awarded attorney's fees to appellees, ordered appellees to "submit evidence of the fees and costs sought," and stated that Arnold "may respond within 7 days of [appellees'] submission." Thus, the final judgment was issued even before the trial court's own response deadline had expired. On this record, we conclude the trial court abused its discretion in ruling on appellees' motion for attorney's fees before the response deadlines set in section 18.001 and the trial court's own orders had expired. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) ("It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, or without regard to guiding legal principles.").

Appellees contend that even if the trial court erred in ruling before Arnold filed her counteraffidavit, any such error was harmless because Arnold was not

---

[8] All references to section 18.001 are to the version in effect before the 2019 amendments. In 2019, section 18.001 was amended in 2019 to modify the deadlines for filing affidavits. Act of May 20, 2019, 86th Leg., R.S., ch. 779, § 1, 2019 Tex. Sess. Law Serv. 2210, 2210–12 (amending TEX. CIV. PRAC. & REM. CODE § 18.001). Because these amendments apply only to actions commenced after September 1, 2019, *id*. § 2, they do not apply to this case.

qualified to controvert appellees' proof. Alternatively, appellees contend any error was cured by the trial court's consideration of Arnold's motion for a new trial.

Appellees maintain that Arnold was not qualified to contest their proof because "she retired in 2007 from the practice of law." The record reflects, however, that Arnold retired from her corporate counsel position in 2007 but did not retire from the practice of law until 2012.[9] Moreover, appellees only contest Arnold's knowledge of "reasonable and customary rates for attorneys engaged in civil litigation in Collin County." However, Arnold's counteraffidavit did not contest the rates charged by appellees' counsel. Rather, she contested the reasonableness and necessity of the work performed, the failure to segregate recoverable and nonrecoverable tasks, the failure to identify the persons performing the tasks and their qualifications to justify the rates billed, and the amount of work performed in light of the nature of the litigation. Appellees do not contend that the nature of civil litigation has changed in these regards over the last ten years such that Arnold would not be qualified to opine as to these aspects of appellees' proof. Accordingly, we conclude that Arnold was qualified to testify as to these aspects of appellees' fee motion. *See* TEX. R. EVID. 702 (an expert qualified "by knowledge, skill, experience, training, or education may testify in the form of an opinion" if her "specialized knowledge will help the trier of fact to understand the evidence or to determine a

---

[9] Arnold reinstated her license in December 2018 to prosecute her claims in this case.

fact in issue"); *Nguyen Ngoc Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 148 (Tex. App.—Houston [14th Dist.] 1986, no writ) ("An affidavit by an attorney representing a party in a suit, concerning an award of attorney's fees, whether in support of or in contradiction of an amount claimed to be reasonable, is admissible in a summary judgment proceeding and is considered expert testimony.").

Alternatively, appellees contend that any error in prematurely awarding attorney's fees was cured by Arnold's motion for new trial and the trial court's subsequent findings of fact and conclusions of law. We have concluded that a trial court had an opportunity to consider appellants' objections to an attorney's fee award "and to modify, correct, or reform the judgment while the motion for new trial was pending" on facts similar to those at issue here. *Qui Phuoc Ho v. MacArthur Ranch, LLC*, No. 05-14-00741-CV, 2015 WL 5093273, at *10 (Tex. App.—Dallas Aug. 28, 2015, pet. denied) (mem. op.). However, we have not held that such an opportunity cured any error in prematurely issuing an award of attorney's fees. *See id.*, at *10–11 (analyzing both sides' fee evidence to determine whether trial court abused its discretion in awarding fees). We decline to do so here.

Our review of the record identifies many of the deficiencies in appellees' proof pointed out by Arnold. First, appellees' fee affidavit recites the affiant's qualifications and experience, but it provides no such information for other attorneys or legal assistants identified in the attached billing records. Additionally, the sum of the fees represented in the unredacted portions of the billing records does not match

those requested in appellees' motion. The billing records also reflect work being performed for certain individual appellees before Arnold had served them. Specifically, Arnold initially served only Addison, Brown, Bruns, and Dixon. Those individual defendants answered and moved to dismiss Arnold's claims. After the trial court dismissed Arnold's declaratory judgment claim against those defendants, and before Arnold filed her amended original petition and served Denton and Maulsby, appellees' billing records reflect work performed for the as-yet unserved defendants.

Moreover, appellees' affidavit contains conflicting claims regarding the need to segregate the fees claims. In one paragraph, the affiant claims that appellees have segregated recoverable fees from nonrecoverable fees while also asserting that "[s]ome of the time spent" on the claims for declaratory relief "was inextricable intertwined with time spent on other claims." Appellees do not identify which tasks were intertwined, explain how they teased out the segregable tasks to arrive at the figure requested, or provide an estimate of the amount of time that would have been necessary even if there had been no nonrecoverable claim. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) (counsel need not maintain separate records for recoverable and nonrecoverable fees; an opinion of the percentage of recoverable time is sufficient).

Finally, although appellees' affidavit cites the *Arthur Andersen* factors, *see Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997), it

provides no explanation as to how appellees' proof meets these factors. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 502 (Tex. 2019) ("Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services."); *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (generalities about tasks performed are insufficient to determine reasonableness and necessity; "[s]ufficient evidence includes, at a minimum, evidence of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required"). Although appellees attached billing records to prove the requested fees were reasonable and necessary, the records are so heavily redacted that it is impossible to assess the necessity of all tasks for which appellees seek recovery. Based on our review of appellees' proof in light of Arnold's counteraffidavit, we conclude fact issues remain as to the reasonableness and necessity of the attorney's fees appellees requested. *See Lujan*, 555 S.W.3d at 84.

Having concluded the trial court erred in issuing final judgment before the deadline for Arnold's counteraffidavit, the error was not harmless or cured, and fact issues remain, we sustain Arnold's fourth issue.

## CONCLUSION

On the record before us, we conclude that the board improperly imposed Capital Assessments between 2011 and 2017 in violation of the 1995 DCCRs. Thus, we sustain Arnold's first issue solely as to this point. We also conclude that the trial court abused its discretion in issuing final judgment awarding attorney's fees before the deadline for Arnold's counteraffidavit had expired. We further conclude that Arnold presented evidence raising a fact issue as to the reasonableness and necessity of the fees sought by appellees. Thus, we sustain Arnold's fourth issue. We overrule Arnold's remaining issues. Accordingly, we reverse the trial court's judgment as to Arnold's complaint that the individual appellees violated the 1995 DCCRs in imposing improper Capital Assessments from 2011 to 2017 and as to the trial court's attorney's fees award. We affirm the trial court's judgment in all other respects and remand the case to the trial court for a determination of damages as to Arnold's Capital Assessment claim and attorney's fees.

/Robbie Partida-Kipness/  
ROBBIE PARTIDA-KIPNESS  
JUSTICE

200001F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANDREA ARNOLD, Appellant

No. 05-20-00001-CV     V.

RANDY ADDISON, ET AL,
Appellees

On Appeal from the 296th Judicial District Court, Collin County, Texas Trial Court Cause No. 296-04121-2018.

Opinion delivered by Justice Partida-Kipness. Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment as to appellant's claim that the individual appellees violated the 1995 DCCRs in imposing improper Capital Assessments from 2011 to 2017 and as to the trial court's attorney's fees award. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 17th day of December 2021.